UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROBBIE C. JOHNSON, individually and as Administrator of the Estate of Tyler R. Johnson, Deceased, and ASHLEY E. RUSSELL, guardian on behalf of H.M.J., minor daughter of Tyler R. Johnson,

Plaintiffs,

-v- 6:22-CV-343

NEW YORK STATE POLICE, NEW YORK STATE TROOPER ROBERT C. ANNARINO, in his official and individual capacities, ONEIDA COUNTY SHERIFF'S DEPUTY EMRAH LATIC, in his individual capacity, AMCARE AMBULANCE SERVICE, a domestic company, PAUL W. TAYLOR, an employee of AmCare, and THE COUNTY OF ONEIDA,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| BELDOCK, LEVINE & HOFFMAN<br>Attorneys for Plaintiffs<br>99 Park Avenue, 26th Floor<br>New York, NY 10016 | JONATHAN C. MOORE, ESQ.<br>JEFFREY F. KINKLE, ESQ. |

FRIEDMAN, GILBERT
& GERHARDSTEIN, LLC
Attorneys for Plaintiffs
50 Public Square, Suite 1900
Cleveland, OH 44113

SARAH J. GELSOMINO, ESQ.
TERRY H. GILBERT, ESQ.

HON. LETITIA JAMES
New York State Attorney General
Attorneys for Defendants New York State Police and New York State Trooper Robert C. Annarino
The Capitol
Albany, NY 12224

CHRISTOPHER HUMMEL, ESQ.
ROBERT J. ROCK, ESQ.
Ass't Attorneys General

KENNEY SHELTON
LIPTAK NOWAK LLP
Attorneys for Defendants Oneida County Sheriff's Deputy Emrah Latic and the County of Oneida
4615 North Street
Jamesville, NY 13078

DAVID H. WALSH, IV, ESQ.
DANIEL CARTWRIGHT, ESQ.

SMITH, SOVIK, KENDRICK
& SUGNET, P.C. - Syracuse Office
Attorneys for Defendants AmCare Ambulance Service and Paul W. Taylor
250 South Clinton Street, Suite 600
Syracuse, NY 13202

STEVEN W. WILLIAMS, ESQ.

DAVID N. HURD
United States District Judge

# TABLE OF CONTENTS

**I. INTRODUCTION** .......... **4**
**II. BACKGROUND** .......... **5**
**III. LEGAL STANDARDS** .......... **9**
A. Rule12(b)(1) .......... 9
B. Rule 12(b)(6) .......... 9
**IV. DISCUSSION** .......... **10**
A. Section 1983 Claims .......... 13
1. State Defendants .......... 13
2. County Defendants .......... 15
i. Deputy Latic .......... 16
a. Unlawful Seizure and Excessive Force .......... 17
b. Failure to Intervene .......... 20
ii. The County .......... 22
a. Widespread Practice .......... 24
a. Failure to Train or Supervise .......... 25
B. Disability Claims .......... 26
1. State Defendants .......... 27
i. Trooper Annarino .......... 28
ii. The State Police .......... 29
a. Merits .......... 30
b. Eleventh Amendment .......... 32
2. County Defendants .......... 36
i. Qualified Individual with a Disability .......... 37
ii. Intentional Discrimination .......... 41
C. State Law Claims .......... 43
1. Negligence .......... 43
2. Pain and Suffering .......... 45
3. Infliction of Emotional Distress .......... 45
4. Wrongful Death .......... 47
**V. CONCLUSION** .......... **51**

## DECISION and ORDER

## I. INTRODUCTION

This civil rights action arises from the untimely death of Tyler R. Johnson ("Tyler" or "decedent").  Tyler, a 24-year-old man who suffered from a serious, disabling seizure disorder, was shot and killed in his home by a New York State Police ("State Police") Trooper named Robert C. Annarino ("Trooper Annarino").  Trooper Annarino had been dispatched to Tyler's house in response to a call for medical assistance made by a family member after he was found lying unresponsive on his bed the evening of April 16, 2020.

On April 11, 2022, plaintiffs Robbie C. Johnson ("Robbie" or "Johnson"), Tyler's father and the administrator of his estate, and Ashley E. Russell ("Russell"), the mother and adult guardian of Tyler's minor daughter H.M.J. (collectively "plaintiffs"), filed this civil action against the State Police, Trooper Annarino, the County of Oneida ("the County"), County Sheriff's Deputy Emrah Latic ("Deputy Latic"), AmCare Ambulance Service ("AmCare"), and AmCare employee Paul W. Taylor ("Paramedic Taylor").

Plaintiffs' thirteen-count complaint alleges 42 U.S.C. § 1983 claims for unlawful seizure and excessive force (Counts One and Two), a failure to intervene (Count Three), municipal liability (Count Six), and a violation of substantive due process (Count Twelve).  The complaint alleges claims under Title II of the Americans with Disability Act ("ADA") and Section 504 of the

Rehabilitation Act (Counts Four and Five). Finally, the complaint alleges state law claims for negligence (Counts Seven and Eight), pain and suffering (Count Nine), the negligent infliction of emotional distress (Count Ten), vicarious liability (Count Eleven), and wrongful death (Count Thirteen).

On June 15, 2022, the State Police and Trooper Annarino (collectively the "State defendants") moved to dismiss the complaint under Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). Dkt. No. 29. The County and Deputy Latic (collectively the "County defendants") have also filed a motion to dismiss under Rule 12(b)(6). Dkt. No. 30. Both motions have been fully briefed and will be considered on the basis of the submissions without oral argument.[1]

## II. <u>BACKGROUND</u>

Prior to the events that resulted in his death, Tyler lived with his father, Robbie, and his father's girlfriend, Melissa Howard, at 4989 Golly Road in the Town of Lee, New York. *See* Compl. ¶ 22. Tyler "had suffered for many years" from seizures. *Id.* ¶ 18. These seizures caused his muscles to stiffen and jerk. *Id.* These seizures also caused him to lose consciousness. *Id.*

On April 16, 2020, at around 7:00 o'clock in the evening, Robbie went into Tyler's bedroom to check on him and found Tyler lying unresponsive on his

---

[1] The State defendants did not reply. The time period in which to do so has expired. *See* Dkt. No. 34.

bed.  Compl. ¶ 23.  Robbie recognized Tyler's symptoms to be consistent with the onset of a seizure, so he shouted to Ms. Howard to call 911.  *Id.* ¶ 24.  Ms. Howard call 911, asked for medical assistance, and told the 911 dispatcher that Tyler was "breathing but not responding."  *Id.* ¶ 25.  Ms. Howard also told the 911 dispatcher that Tyler "might have been experiencing a drug overdose" but that he also had "a seizure disorder."  *Id.* ¶ 26.

Shortly after Ms. Howard first called 911, Ashley Johnson, Tyler's sister, arrived at the house.  Compl. ¶ 27.  Ashley was familiar with the symptoms of Tyler's seizures.  *Id.*  She saw that Tyler was "lying on his left side with his arms across his chest and his fists clenched."  *Id.*  She also saw that he "was drenched in sweat and light purple and that his eyelids were twitching."  *Id.*

Ashley recognized that these were the "typical symptoms" of one of Tyler's seizures.  Compl. ¶ 27.  She told Ms. Howard, who "got back on the line" with 911 and informed the 911 dispatcher that Tyler was in fact experiencing one of his seizures.  *Id.* ¶ 28.  According to the complaint, the 911 dispatch log indicates that the 911 dispatcher "updated the police department" with this additional, important information.  *Id.* ¶ 29.

This was hardly Tyler's first seizure.  *See* Compl. ¶ 30.  The Johnson family had called 911 many times in the past when Tyler experienced one of these seizures.  *Id.*  But each time that the Johnson family had called 911 in the past, medical personnel had responded to their call for assistance.  *Id.*

This time, however, Trooper Annarino responded to the 911 call for medical assistance.  Compl. ¶ 31.  When Trooper Annarino arrived at the Johnson family's house, Robbie was kneeling on the floor next to his son's bed "rubbing his back, arms, and head to calm him down" in a manner that was consistent with Robbie's understanding of how to help someone experiencing a seizure.  *Id.* ¶¶ 32–33.  Robbie also informed Trooper Annarino that Tyler was having a seizure.  *Id.* ¶ 34.

Even so, Trooper Annarino ordered everyone out of the room.  Compl. ¶ 35. He then grabbed Tyler's shoulders and attempted—and failed—to push Tyler onto his back.  *Id.* ¶ 36.  Trooper Annarino's approach to Tyler's seizure was in "direct contravention of medical best practices."  *Id.*  Trooper Annarino then radioed dispatch to advise that the scene was secure and that someone from Emergency Medical Services ("EMS") could enter Tyler's room.  *Id.* ¶ 37.

Paramedic Taylor was on duty that day.  Compl. ¶ 38.  He had been to the Johnson's house before.  *Id.* ¶ 39.  He had responded to other medical calls about Tyler's seizure disorder.  *Id.*  So Paramedic Taylor was well aware of Tyler's medical condition and his prior history of seizures.  *Id.*  Indeed, when Paramedic Taylor entered the bedroom, Trooper Annarino even advised him that he also believed Tyler was having a seizure.  *Id.* ¶ 43.

Despite the fact that it was inappropriate to do so, Trooper Annarino again attempted to forcefully push Tyler onto his back.  Compl. ¶ 44.  And

although Paramedic Taylor knew this approach was a totally inappropriate way to treat a person experiencing a seizure, he chose to assist Trooper Annarino in "forcibly restraining" Tyler by "grabbing his right leg." *Id.* ¶ 45. According to the complaint, despite being a trained medical officer Paramedic Taylor failed to instruct or advise Trooper Annarino about the medically appropriate way to deal with a person experiencing a seizure. *Id.* ¶ 46.

At this time, Tyler's seizure began to subside. Compl. ¶ 48. But he was still disoriented and confused. *Id.* He did not know why Trooper Annarino and Paramedic Taylor were pushing him down or grabbing his leg. *Id.* He told both defendants to get off of him. *Id.* ¶ 49. He tried to sit up. *Id.* ¶ 50.

Neither Trooper Annarino nor Paramedic Taylor released their grip on Tyler. Compl. ¶ 50. So Tyler began to struggle against them. *Id.* Deputy Latic arrived while this was happening. *Id.* ¶ 52. Deputy Latic began to help Trooper Annarino and Paramedic Taylor hold Tyler down. *Id.* ¶ 53. Deputy Latic managed to get his arms wrapped around Tyler's legs. *Id.* ¶ 54.

While Deputy Latic and Paramedic Taylor wrestled with Tyler's legs, Trooper Annarino fired three gunshots at decedent. Compl. ¶ 54. Decedent fell to the floor on his hands and knees. *Id.* ¶ 55. Trooper Annarino fired two more gunshots at decedent. *Id.* ¶ 56. Robbie, decedent's father, was in the immediate vicinity of the encounter and witnessed his son's death. *Id.* ¶ 57.

Decedent was taken to Rome Memorial Hospital, unresponsive and in full cardiac arrest.  Compl. ¶ 60.  He was pronounced dead at 8:02 p.m.  *Id.*  The proximate cause of his death was determined to be the injuries he sustained as a result of Trooper Annarino's gunshots.  *Id.* ¶ 61.

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."  *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002)).

### B.  Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV. DISCUSSION

Broadly speaking, plaintiffs' thirteen-count complaint asserts three distinct kinds of claims: (A) civil rights claims under § 1983; (B) disability claims under Title II of the ADA and Section 504 of the Rehabilitation Act; and (C) a variety of state law tort claims.[2]

First, plaintiffs allege § 1983 claims against Trooper Annarino and Deputy Latic for unlawful seizure and excessive force (Counts One and Two) and for a violation of substantive due process (Count Twelve). The complaint also alleges a § 1983 claim against Deputy Latic for a failure to intervene in

[2] As the State defendants point out in their moving papers, certain claims are held by certain named plaintiffs and not others (*e.g.*, the wrongful death claim is held by decedent's minor daughter as a distributee of his estate). But both motions seek dismissal of certain claims, not certain plaintiffs, and so the analysis that follows focuses on the claims asserted in the pleading.

Trooper Annarino's use of force (Count Three). Finally, the complaint alleges a § 1983 municipal liability claim against the County (Count Six).

Second, the complaint alleges disability-related claims under Title II of the ADA and Section 504 of the Rehabilitation Act against the State Police and the County (Count Four) and against Trooper Annarino in his official capacity (Count Five).

Third, the complaint alleges claims against AmCare for negligent hiring, training and/or discipline (Count Seven) and for vicarious liability (Count Eleven). The complaint alleges claims against Paramedic Taylor, Trooper Annarino, and Deputy Latic for negligence (Count Eight), pain and suffering (Count Nine), and the infliction of emotional distress (Count Ten). Finally, the complaint alleges a claim against AmCare, Paramedic Taylor, Trooper Annarino, and Deputy Latic for wrongful death (Count Thirteen).

The State defendants have moved to dismiss the claims under Title II of the ADA and Section 504 of the Rehabilitation Act asserted against them (Counts Four and Five) as barred by the Eleventh Amendment. State Defs.' Mem., Dkt. No. 29-1 at 3, 6–9.[3] In the alternative, the State defendants argue these claims should be dismissed for failure to state a plausible claim for relief. *Id.* at 9–11. As for plaintiffs' § 1983 claims, the State defendants

[3] Pagination corresponds to CM/ECF.

argue that the substantive due process claim asserted against Trooper Annarino (in Count Twelve) must be dismissed as duplicative of the excessive force claim pleaded against him (in Count One). *Id*. at 11–13. Finally, the State defendants argue the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims against Trooper Annarino (Counts Eight, Nine, Ten, and Thirteen) or, failing that, the Court should dismiss those claims on the merits. *Id*. at 14–16.

The County defendants have moved to dismiss all of the claims asserted against them. County Defs.' Mem., Dkt. No. 30-1 at 9. According to the County defendants, plaintiffs' § 1983 claims against Deputy Latic (Counts Two, Three, and Twelve) fail as a matter of law. *Id*. at 10–15, 24–28. The County defendants also argue that plaintiffs' § 1983 municipal liability claim against the County (Count Six) should be dismissed because it relies on nothing more than "boilerplate" allegations. *Id*. at 18–20. The County defendants further contend that the disability claims that are asserted against the County (Count Four) should be dismissed for failure to state a claim. *Id*. at 16–20. Finally, the County defendants argue that the state law tort claims asserted against Deputy Latic (Counts Eight, Nine, Ten, and Thirteen) fail on the merits. *Id*. at 21–28.

## A. Section 1983 Claims

The complaint alleges § 1983 claims against Trooper Annarino and Deputy Latic for unlawful seizure and excessive force (Counts One and Two) and for a violation of substantive due process (Count Twelve). The complaint also alleges a § 1983 claim against Deputy Latic for a failure to intervene in Trooper Annarino's use of deadly force (Count Three). Finally, the complaint alleges a § 1983 municipal liability claim against the County (Count Six).

### 1. State Defendants

As an initial matter, the State defendants have not moved to dismiss plaintiffs' § 1983 individual-capacity claim against Trooper Annarino for unlawful seizure and excessive force (Count One). Accordingly, that claim remains for discovery.

However, the State defendants have moved to dismiss plaintiffs' § 1983 individual-capacity claim against Trooper Annarino alleging the violation of substantive due process (Count Twelve). According to the State defendants, this claim is duplicative of the unlawful seizure and excessive force claim alleged in Count One. State Defs.' Mem. at 11–13. In the alternative, the State defendants argue that this claim fails on the merits. *Id.*

Plaintiffs' § 1983 substantive due process claim is based on the "right to be free from wrongful government interference with familial relationships and to companionship, society, and support." Compl. ¶ 132. As relevant here,

"[t]he Fourteenth Amendment guarantees a substantive right under the Due Process Clause to intimate familial association." *Gorman v. Rensselaer Cnty.*, 910 F.3d 40, 47 (2d Cir. 2018). To state a § 1983 "intimate association" claim, plaintiffs must allege: (1) conduct "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection;" and (2) that the "state action was specifically intended to interfere with the family relationship." *Id.* at 47–48.

Measured against *Gorman*'s requirements, plaintiffs' § 1983 "intimate association" claim must be dismissed. Although the complaint alleges that Trooper Annarino "intentionally" interfered with the Johnson family's right to familial association when he ordered everyone out of decedent's room and then used deadly force against him, compl. ¶¶ 132–33, the complaint fails to plausibly allege that this interference was anything more than "indirect and incidental" to defendant's other alleged conduct, *Gorman*, 910 F.3d at 48.

Importantly, the Second Circuit has cautioned that an "intimate association" claim requires direct, intentional conduct that was "specifically intended" to interfere in the familial relationship itself. To be sure, plaintiffs have alleged serious misconduct: the unprovoked shooting death of decedent during a medical episode. But plaintiffs have not alleged the specific kind of misconduct required to state a plausible "intimate association" claim.

For instance, plaintiffs have not alleged that Tyler's father protested Trooper Annarino's order to leave the bedroom or indicated that he desired to remain in the room with decedent at the time of the events that led to Tyler's death. *Albert v. City of N.Y.*, 2019 WL 3804654, at *4 (E.D.N.Y. Aug. 13, 2019) (rejecting "intimate association" claim for similar reasons).

Nor have plaintiffs alleged that Trooper Annarino's misconduct was directed at the Johnson's familial relationship itself. *Albert*, 2019 WL 3804654, at *3 ("Where the defendants were motivated by other legitimate interests—rather than an intent to deprive the plaintiff of [his] rights to associate with [ ] family members—such a claim cannot survive.").

In short, the "complaint is devoid of facts that would plausibly suggest that interference with the family relationship was anything other than an incidental consequence of defendants' actions." *Albert*, 2019 WL 3804654, at *4 (citation omitted); *see also Ranta v. City of N.Y.*, 2015 WL 5821658, at *7 (E.D.N.Y. Sept. 30, 2015) (rejecting "intimate association" claim where complaint alleged conduct that had "only an incidental effect" on the familial relationship). Accordingly, plaintiffs' § 1983 substantive due process claim against Trooper Annarino (Count Twelve) must be dismissed.

**2. <u>County Defendants</u>**

As noted *supra*, plaintiffs allege § 1983 individual-capacity claims against Deputy Latic for unlawful seizure and excessive force (Count Two), for the

failure to intervene in Trooper Annarino's use of force (Count Three), and for a violation of substantive due process (Count Twelve). The complaint also alleges a § 1983 municipal liability claim against the County (Count Six).

The County defendants have moved to dismiss all four of these § 1983 claims. According to the County defendants, plaintiffs' § 1983 claims against Deputy Latic (Counts Two, Three, and Twelve) fail on the merits. County Defs.' Mem. at 10–15, 24–28. The County defendants also argue the § 1983 municipal liability claim against the County (Count Six) should be dismissed because it relies on nothing more than "boilerplate" allegations. *Id.* at 18–20

In opposition, plaintiffs concede that their § 1983 claim against Deputy Latic alleging a violation of substantive due process (Count Twelve) should be dismissed. Pls.' Opp'n to County, Dkt. No. 36 at 6 n.1. Accordingly, Count Twelve will be dismissed against Deputy Latic. However, plaintiffs oppose the dismissal of the other § 1983 claims. *See generally id.*

**i. <u>Deputy Latic</u>**

Plaintiffs allege § 1983 claims against Deputy Latic for unlawful seizure and excessive force (Count Two) and for the failure to intervene in Trooper Annarino's use of force (Count Three).

**a. <u>Unlawful Seizure and Excessive Force</u>**[4] (Count Two)

"Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen are analyzed under the Fourth Amendment[.]" *Kaplan v. Cnty. of Orange*, 528 F. Supp. 3d 141, 170 (S.D.N.Y. 2021) (cleaned up).

"To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 331 (N.D.N.Y. 2021) (cleaned up). This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 331 (citation omitted).

Thus, review of an excessive force claim is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the

[4] Plaintiffs style this claim as "unlawful seizure *and* excessive force." These are often treated as two distinct Fourth Amendment claims: a plaintiff often alleges an excessive use of force during the course of an allegedly unauthorized arrest. *See, e.g.*, *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (explaining that false arrest claims are grounded in the Fourth Amendment right to be free from "unreasonable seizures"). Here, however, plaintiffs allege excessive force was used during the course of an unreasonable seizure that ended with decedent's death. However characterized, this claim triggers the Fourth Amendment's protections. *Cf. Torres v. Madrid*, 141 S. Ct. 989, 993 (2021).

officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *LaFever*, 525 F. Supp. 3d at 331.

Plaintiffs allege that when Deputy Latic first arrived on scene, he assisted Trooper Annarino and Paramedic Taylor in holding Tyler down by wrapping his arms around decedent's legs. Compl. ¶¶ 48–58. Plaintiffs further allege that Deputy Latic continued to struggle and try to hold Tyler down while Trooper Annarino shot him five times in two separate volleys of gunfire. *Id.*

Upon review, these facts are sufficient to plausibly allege that Deputy Latic violated decedent's Fourth Amendment rights. Where, as here, "a defendant has moved to dismiss an excessive force claim at the pleadings stage, dismissal is only appropriate if, accepting all of the allegations as true, it is clear that the force used by the officer[ ] was objectively reasonable under the circumstances." *Kaplan*, 528 F. Supp. 3d at 170 (citation omitted).

Deputy Latic has not done so. Plaintiffs allege Deputy Latic used physical force in an ongoing attempt to restrain decedent, who was not suspected of any crime, did not pose any immediate threat to anyone's safety, and was not attempting to flee but was instead known by officers to be recovering from a serious medical episode. Under those facts, it is impossible to conclude that Deputy Latic's alleged conduct was "objectively reasonable" as a matter of law. Indeed, it is hard to fathom how the use of any force was warranted under those circumstances.

To avoid this obvious conclusion, the County defendants rely on *Norwood v. Graham*, 2020 WL 7480943 (N.D.N.Y. Dec. 18, 2020).  In *Norwood*, the *pro se* plaintiff was arrested by multiple officers on the basis of an active parole arrest warrant.  *Id*. at *1.  The plaintiff alleged, *inter alia*, that officers had used excessive force against him because one officer restrained the plaintiff while another officer placed him in handcuffs.  *Id*.  On summary judgment, Judge D'Agostino dismissed the plaintiff's excessive force claim against the officer who restrained the plaintiff because, under the circumstances, the officer's conduct was objectively reasonable as a matter of law.  *Id*. at *3.

But those are not the facts alleged by plaintiffs in this case, and this is not summary judgment.  "Whether [the] use of force was justified under the circumstances – for example, whether and to what extent [decedent] ever posed a threat to [officer] safety, and whether [Deputy Latic's] response was proportionate to that threat – requires a detailed and fact-specific inquiry, and would be inappropriate for this Court to decide at the motion to dismiss stage."  *Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 321 (W.D.N.Y. 2021); *see also Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020) (opining that the fact-specific nature of excessive force claims often warrants discovery and a trial on the merits).  Accordingly, the County defendants' motion to dismiss plaintiffs' § 1983 excessive force claim against Deputy Latic will be denied.

**b. <u>Failure to Intervene</u>** (Count 3)

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "A police officer therefore can be held liable for his failure to intervene if he or she observes the use of excessive force and has sufficient time to act but takes no steps to prevent it." *Merrill v. Schell*, 279 F. Supp. 3d 438, 445 (W.D.N.Y. 2017).

"To state a claim for failure to intervene, a complaint must plead that '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'" *Rosario v. City of N.Y.*, 2019 WL 4450685, at *7 (S.D.N.Y. Sept. 16, 2019) (citations omitted).

Plaintiffs acknowledge that Deputy Latic did not arrive on the scene until after Trooper Annarino and Paramedic Taylor had already began struggling with decedent. Compl. ¶¶ 50–51. However, plaintiffs allege that Deputy Latic entered the room before Trooper Annarino used deadly force. *Id.* ¶ 52. They further allege that Deputy Latic had "sufficient time" to intercede on decedent's behalf; *e.g.*, plaintiffs allege Deputy Latic had sufficient time to advise Trooper Annarino to stop struggling with decedent as he recovered

from his seizure. *Id.* ¶ 53. Plaintiffs allege Deputy Latic did not attempt to intervene or intercede. *Id.* ¶¶ 50–54. Instead, plaintiffs allege that Deputy Latic wrapped his arms around decedent's legs while Trooper Annarino administered two separate volleys of gunfire. *Id.* ¶¶ 54–56.

Upon review, these facts are sufficient to plausibly allege that Deputy Latic is liable for a failure to intervene. In an effort to avoid this result, the County defendants argue that plaintiffs have failed to plausibly allege that Deputy Latic had "a realistic opportunity to intervene to prevent the harm from occurring." County Defs.' Mem. at 13–15. According to the County defendants, the fast-paced nature of the incident deprived Deputy Latic of a realistic opportunity to intervene. *See id.*

This argument must be rejected because it is too fact-specific an inquiry to resolve at this early stage of the case. "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557 (citation omitted). But as the Second Circuit has cautioned, there is no "bright-line rule" in a failure-to-intervene case. *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). To the contrary, these claims arise "out of a limitless variety of factual circumstances." *Id.* "In each case, the question whether a defendant had a realistic chance to intercede with turn on such factors as the number of officers present, their

relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Id.*

At this early stage of the litigation, it is unclear precisely how much time passed between Deputy Latic's arrival on the scene and the conclusion of the entire incident. To be sure, discovery might reveal that Trooper Annarino's escalation to the use of deadly force occurred so swiftly that Deputy Latic had no "realistic opportunity" to intervene on decedent's behalf. Again, though, this is not summary judgment. Accordingly, the County defendants' motion to dismiss plaintiffs' § 1983 failure-to-intervene claim against Deputy Latic will be denied.

**ii. <u>The County</u>** (Count Six)

Plaintiffs allege a § 1983 municipal liability claim against the County (Count Six). According to the complaint, Deputy Latic's alleged misconduct "was directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by" the County. Compl. ¶ 100. In addition, the complaint alleges that the County "failed to properly train, supervise, and discipline law enforcement officers in the lawful treatment of disabled individuals" and that, as a result, Deputy Latic violated decedent's constitutional rights. *Id.* ¶¶ 103–104.

"[T]o establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that the deprivation of his constitutional right was 'caused by a governmental custom, policy or usage of the municipality.'" *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (quoting *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order)). "The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and it may be "reflected in either action or inaction," *Cash v. Cnty. of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011). Accordingly, municipal liability under § 1983 may be established through:

> (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to "deliberate indifference" to the rights of those who come into contact with the inadequately trained or supervised municipal employees.

*Crawley*, 496 F. Supp. 3d at 729 (cleaned up).

As noted *supra*, plaintiffs allege that Deputy Latic's alleged misconduct was "directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned" by the County, "whereby written policies are ignored in practice in favor of *de facto*

policies or, alternatively, by failing to maintain appropriate policies in the first place." Compl. ¶ 100. In addition, plaintiffs allege that the County "failed to properly train, supervise, and discipline law enforcement officers in the lawful treatment of disabled individuals" and that, as a result, Deputy Latic violated decedent's constitutional rights. *Id.* ¶¶ 103–104.

In other words, plaintiffs have attempted to plead the third and/or fourth theories of municipal liability: (1) a widespread municipal practice arising to a *de facto* custom of which policymakers must be aware; and/or (2) a failure by policymakers to adequately train or supervise its officers.

**a. <u>Widespread Practice</u>**

The third theory of *Monell* liability, a widespread practice arising to a *de facto* custom, "is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (collecting cases). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.* (collecting cases). However, isolated acts by non-policymaking municipal employees are generally insufficient to demonstrate a municipal custom, policy, or usage that would justify the imposition of municipal

liability. *Hicks v. City of Syracuse*, 2018 WL 6308653, at *4 (N.D.N.Y. Dec. 3, 2018) (citing *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012)).

Upon review, plaintiffs have alleged only a single, isolated incident by a non-policymaking official. Plaintiffs have failed to allege any other instances that might plausibly support the existence of a broader, widespread pattern or practice of deliberate indifference to the constitutional rights of citizens, particularly those with disabilities. *See Strong v. City of Syracuse*, 2020 WL 137250, at *3 (N.D.N.Y. Jan. 13, 2020).

Because plaintiffs' allegations of a *de facto* policy regarding disabled individuals are phrased in wholly conclusory terms, they are "insufficient to sustain or 'raise a reasonable expectation that discovery will reveal evidence' in support of [plaintiffs'] claim," *Schnauder v. Gibens*, 679 F. App'x 8, 10 (2d Cir. 2017) (summary order) (citation omitted). Accordingly, plaintiffs have failed to plausibly allege a municipal liability claim on this basis.

**b. <u>Failure to Train or Supervise</u>**

To make out a failure to train or supervise theory, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Werkheiser v. County of Broome*, 2023 WL 1927696, at *13 (N.D.N.Y. Feb. 9, 2023) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "A pattern of similar constitutional violations by untrained

employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* (citation omitted).

As noted *supra*, plaintiffs have failed to allege any pattern of similar constitutional violations by the County. Because conclusory allegations are insufficient to plausibly allege a municipal liability claim, *Werkheiser*, 2023 WL 1927696, at *13, plaintiffs have failed to plausibly allege a municipal liability claim on this basis. Accordingly, plaintiffs' § 1983 municipal liability claim against the County (Count Six) will be dismissed.

**B. <u>Disability Claims</u>**

Plaintiffs' complaint alleges claims under Title II of the ADA and Section 504 of the Rehabilitation Act against the State Police and the County (Count Four) and against Trooper Annarino in his official capacity (Count Five).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[5] As the Second Circuit has explained, "[a] plaintiff may base [a] Title II claim on any of three theories of liability: disparate treatment (intentional discrimination),

[5] "As the standards for actions under Title II of the ADA and the Rehabilitation Act are generally equivalent, a court analyzes such claims together for purposes of determining whether a plaintiff has stated a *prima facie* claim." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) (cleaned up).

disparate impact, or failure to make a reasonable accommodation." *Tardif v. City of N.Y.*, 991 F.3d 394, 404 (2d Cir. 2021).

However, "in order to recover damages under Title II of the ADA and the Rehabilitation Act, the plaintiff must show that the discrimination was intentional." *Butchino v. City of Plattsburg*, 2022 WL 137721, at *9 (N.D.N.Y. Jan. 14, 2022) (D'Agostino, J.) (citing *Vassenelli v. State Univ. of N.Y.*, 2018 WL 1406629, at *3 (N.D.N.Y. Mar. 19, 2018)).

"To prove intentional discrimination under Title II, a plaintiff must allege facts showing that a policymaker acted with ill will or personal animosity toward him because of his disability or that the policy maker acted with deliberate indifference to his rights under the ADA." *Vassenelli*, 2018 WL 1406629, at *3 (cleaned up). "The standard for intentional violations is deliberate indifference to the strong likelihood of a violation." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (cleaned up).

**1. State Defendants**

The State defendants have moved to dismiss the claims under Title II of the ADA and Section 504 of the Rehabilitation Act asserted against them (Counts Four and Five) as barred by the Eleventh Amendment. State Defs.' Mem. at 3, 6–9. In the alternative, the State defendants argue these claims should be dismissed on the merits. *Id.* at 9–11.

**i. <u>Trooper Annarino</u>**

As an initial matter, plaintiffs' ADA and Rehabilitation Act claims against Trooper Annarino in his official capacity (Count Five) must be dismissed because they are redundant of plaintiffs' ADA and Rehabilitation Act claims against the State Police (Count Four).

"[T]here is a split of authority as to whether the ADA and Rehabilitation Act provide for liability against individual defendants in their official capacities." *Killoran ex rel. Killoran v. Westhampton Beach Sch. Dist.*, 2022 WL 866816, at *8 (E.D.N.Y. Mar. 22, 2022) (citation omitted). On one hand, "[n]umerous district court judges in this Circuit have held that official capacity suits for monetary damages are not cognizable under the ADA or Rehabilitation Act." *Scalercio-Isenberg v. Port Auth. of N.Y.*, 2018 WL 1633767, at *5 (S.D.N.Y. Mar. 31, 2018) (collecting cases). On the other hand, "courts have held that official capacity lawsuits are permissible under the ADA and Rehabilitation Act." *Id.* "Courts in the latter group rest their conclusion on the premise that an official-capacity suit naming an individual is effectively a suit against the government entity." *Id.* at *6.

Nevertheless, the question of whether official capacity suits for monetary relief are available under the ADA or Rehabilitation Act need not be resolved because the answer to the question under either theory will lead to dismissal of plaintiffs' claims against Trooper Annarino. *See Scalercio-Isenberg*, 2018

WL 1633767, at *5. Indeed, even if the claims were cognizable, they would be redundant because Trooper Annarino in his "official capacity" was acting as a representative of the State Police. *See id.*; *Constantine v. Merola*, 2021 WL 2417514, at *2 n.2 (N.D.N.Y. June 14, 2021). In short, "there is no reason to permit duplicate claims to proceed against both parties." *Scalercio-Isenberg*, 2018 WL 1633767, at *5 (citing *Hallett v. N.Y. State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 200 (S.D.N.Y. 2000)). Accordingly, plaintiffs' ADA and Rehabilitation Act claims against Trooper Annarino (Count Five) will be dismissed as redundant of plaintiffs' claims against the State Police.

**ii. <u>The State Police</u>**

The State defendants have moved to dismiss the claims under Title II of the ADA and Section 504 of the Rehabilitation Act asserted against the State Police (Count Four) as barred by the Eleventh Amendment. State Defs.' Mem. at 3, 6–9. In the alternative, the State defendants argue these claims should be dismissed on the merits. *Id.* at 9–11.

Ordinarily, the Eleventh Amendment question would need to be resolved first because it is jurisdictional in nature. However, "if Plaintiff fails to allege an actionable ADA violation at the outset, [ ] questions of sovereign immunity are irrelevant." *Colon v. N.Y. State Dep't of Corrs. & Cmty. Supervision*, 2017 WL 4157372, at *6 (S.D.N.Y. Sept. 15, 2017). To assert a claim under either Title II of the ADA or Section 504 of the Rehabilitation Act, plaintiffs must

plausibly allege that: (1) decedent was a qualified individual with a disability; (2) defendants are subject to one of the Acts; and (3) decedent was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability.

**a. <u>Merits</u>**

The State defendants concede that decedent was a "qualified individual with a disability." State Defs.' Mem. at 9–11. They also concede that the State Police is an entity subject to the Acts. *See id.* Instead, the State defendants argue that plaintiffs have not plausibly alleged the third requirement; *i.e.*, that decedent was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against, by defendants because of his disability. *Id.*

As noted *supra*, plaintiffs allege that defendants failed to reasonably accommodate decedent's disability by failing to provide "adequate training, resources, supervision, or discipline to law enforcement regarding the appropriate way of responding to individuals who exhibit the signs and symptoms of seizure disorders, including by failing to instruct officers not to restrain someone having a seizure and to keep them on the side of their body." Compl. ¶ 85.

The State defendants contend that "these allegations allege that Plaintiff was not properly treated for his seizure disorder, not that he was denied a service, program or activity *because* of his seizure disorder."  State Defs.' Mem. at 10.  According to the State defendants, "[t]his flaw is fatal to [p]laintiffs' claims" because "[c]ourts have concluded that Title II of the ADA and Rehabilitation Act prohibit 'discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question.'"  *Id.* (citation omitted).

In opposition, plaintiffs assert that their "claim is not that [d]ecedent received inadequate medical treatment as a result of his disability, but instead that he was denied the provision of *lawful police services* as a result of the [d]efendants' failure to accommodate his disability."  Pls.' Opp'n to State Defs.' Mem. at 22 (emphasis in original).  According to plaintiffs, "[c]ourts have routinely recognized claims like this one under the ADA and Rehabilitation Act where, just as here, the police failed to reasonably accommodate an individual's disability while providing law enforcement services."  *Id.*

Upon review, plaintiffs have plausibly alleged claims under Title II of the ADA and Section 504 of the Rehabilitation Act against the State Police.  As plaintiffs point out, "the failure to provide a reasonable accommodation to a service or benefit . . . is a quintessential failure to accommodate disability

claim." *Butchino*, 2022 WL 137721, at *12. As plaintiffs also note, numerous courts have recognized this principle in the context of law enforcement officials interacting with disabled individuals. *See, e.g.*, *Durr v. Slator*, 558 F. Supp. 3d 1, 30–33 (N.D.N.Y. 2021) (D'Agostino, J.) (denying motion to dismiss where plaintiff with a history of mental illness alleged that defendant-officers should have used de-escalation techniques instead of placing him in handcuffs); *Butchino*, 2022 WL 137721, at *10–12 (denying summary judgment where plaintiff, an individual diagnosed with post-traumatic stress disorder, alleged that defendant-officers should have "allowed him to cool off before forcibly removing his shorts"). Accordingly, plaintiffs' claims under Title II of the ADA and Section 504 of the Rehabilitation Act against the State Police (Count Four) remain for discovery.

**b. <u>Eleventh Amendment</u>**

The remaining question is whether these ADA and Rehabilitation Act claims against the State Police, which seek money damages rather than injunctive relief, are barred by the Eleventh Amendment.

Generally speaking, "[t]he Eleventh Amendment bars a damages action in federal court against a state and its officials when acting in their official capacity unless the state has waived its sovereign immunity or Congress has abrogated it." *Dean*, 804 F.3d at 193. "State immunity extends not only to

the states, but also to state agencies." *Matagrano*, 2020 WL 7338586, at *15 (citations omitted).

First off, the Eleventh Amendment does not bar a damages action brought under the Rehabilitation Act. "[I]n enacting § 504 of the Rehabilitation Act, Congress expressed its clear intent to condition a state's acceptance of federal funds on the state's waiver of its Eleventh Amendment immunity." *De Figueroa v. New York*, 403 F. Supp. 3d 133, 150 (E.D.N.Y. 2019) (cleaned up).

"Courts in this Circuit have held that New York State's continued receipt of federal funds under § 504 . . . constitutes a knowing waiver of sovereign immunity." *De Figueroa*, 403 F. Supp. 3d at 150 (cleaned up). Accordingly, New York's acceptance of federal funds on behalf of the State Police is sufficient to plausibly allege the knowing waiver of sovereign immunity. *See* Compl. ¶ 81 (alleging that the State Police receive federal funds).

However, "[i]t is a more complicated question whether the Eleventh Amendment precludes recovery of money damages against New York state and its officials under Title II of the ADA which, in contrast to the Rehabilitation Act, was not enacted pursuant to Congress's power under the Spending Clause of Article I." *Thompson v. N.Y. State Corr. & Cmty. Supervision*, 2022 WL 4562318, at *12 (W.D.N.Y. Sept. 29, 2022)

"In *Garcia v. State Univ. of N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir. 2001), the Second Circuit addressed the question of whether

Congress had validly abrogated state sovereign immunity from claims for monetary damages under Title II of the ADA." *Matagrano*, 2020 WL 7338586, at *15. "The Court held that 'it is clear that the Congress fully intended to abrogate state sovereign immunity' from such claims, but that this purported abrogation was not valid, as the enactment of Title II exceeded Congress's authority under § 5 of the Fourteenth Amendment[.]" *Id.* (quoting *Garcia*, 280 F.3d at 108–10). However, "the Court found that Title II could be rehabilitated by requiring 'plaintiffs bringing such suits to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability.'" *Id.* (quoting *Garcia*, 280 F.3d at 111).

Even so, "it is unclear whether *Garcia*'s requirement that a plaintiff establish animus or ill will in order to abrogate sovereign immunity survives in the wake of the Supreme Court's rulings in *Tennessee v. Lane*, 541 U.S. 509 (2004), and *United States v. Georgia*, 546 U.S. 151 (2006)." *Russell v. New York*, 2019 WL 4805687, at *4 (S.D.N.Y. Sept. 30, 2019) (citations omitted).

"In *Lane*, the Supreme Court held that Title II validly abrogates a state's sovereign immunity as applied to cases implicating a plaintiff's fundamental right of access to the courts," "while in *Georgia*, the Supreme Court concluded that 'insofar as Title II creates a private cause of action for damages against

the States for conduct that *actually violates* the Fourteenth Amendment,
Title II validly abrogates state sovereign immunity.'" *Id.* (citations omitted).

In light of the continued uncertainty, "District Courts have taken varying
approaches to the continuing validity of *Garcia*." *Matagrano*, 2020 WL
7338586, at *16. "When determining whether Congress has validly
abrogated states' sovereign immunity over Title II claims that do not
independently implicate a constitutional violation, some courts have
continued to apply *Garcia*'s 'discriminatory animus or ill will' requirement."
*Id.* (collecting cases). "Others have applied the three-part test articulated in
*City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) to determine whether, for
the particular Title II violation alleged, there is a 'congruence and
proportionality between the injury to be prevented or remedied and the
means adopted to that end.'" *Matagrano*, 2020 WL 7338586, at *16
(collecting cases).

The State defendants argue that the *Garcia* test should be applied.  But
they do not address the conflicting case law on whether *Garcia* remains good
law after *Lane* and *Georgia*.  State Defs.' Mem. at 6–9; *see also Matagrano*,
2020 WL 7338586, at *17.  The State defendants have also failed to explain
why plaintiffs' allegations would not survive a sovereign immunity challenge
under the frameworks that *Garcia* endorses.  State Defs.' Mem. at 6–9; *see
also Matagrano*, 2020 WL 7338586, at *17.  Nor do the State defendants put

forth any arguments about whether plaintiffs' disability claims could survive an Eleventh Amendment defense under any approach other than *Garcia*, such as the *City of Boerne* test applied by some lower courts. *See* State Defs.' Mem. at 6–9; *see also Matagrano*, 2020 WL 7338586, at *17.

"In the absence of more complete briefing from the parties on these questions, the Court need not wade into these turbulent constitutional waters." *Matagrano*, 2020 WL 7338586, at *18. Importantly, "in the Second Circuit, the state entity asserting an Eleventh Amendment defense bears the burden of demonstrating that it is entitled to dismissal of the lawsuit on the ground of Eleventh Amendment immunity." *Id.* at *18 (cleaned up). Thus, because State defendants bear the burden of demonstrating that plaintiffs' claim must be dismissed on Eleventh Amendment grounds, and "for the reasons identified above, they have not done so," their Eleventh Amendment argument fails at this early stage of the proceedings.[6] *Id.*

**2. <u>County Defendants</u>**

The County defendants have moved to dismiss the claims under Title II of the ADA and Section 504 of the Rehabilitation Act that are asserted against the County (Count Four). County Defs.' Mem. at 16–20. To assert a claim under either Title II of the ADA or Section 504 of the Rehabilitation Act,

---

6 The need to resolve the Eleventh Amendment issue at the pleading stage is lessened even further given that plaintiffs' Rehabilitation Act claims against State Police survives. *Matagrano*, 2020 WL 7338586, at *18 (citations omitted).

plaintiffs must allege: (1) decedent was a qualified individual with a disability; (2) defendants are subject to one of the Acts; and (3) decedent was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability.

The County defendants concede that the County is "subject to one of the Acts." County Defs.' Mem. at 15–18. However, they argue that plaintiffs' claims under Title II of the ADA and Section 504 of the Rehabilitation Act should be dismissed because (i) the complaint fails to plausibly allege that decedent was "a qualified individual with a disability"; and (ii) the complaint fails to plausibly allege that the alleged discrimination was "intentional." *Id.*

**i. <u>Qualified Individual with a Disability</u>**

Generally speaking, the Americans with Disabilities Act defines a "disability" as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). However, "[n]ot every impairment is a 'disability' within the meaning of the ADA." *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005). Instead, there are two major qualifications: (1) the claimed impairment must limit a "major life activity" and (2) the limitation must be "substantial." *Id.*

As to the first qualification, major life activities include physical functions like walking, standing, and lifting as well as other common activities such as

reading, concentrating, and working. 42 U.S.C. § 12102(2)(A). As to the second qualification, a plaintiff's impairment must "substantially limit[ ] the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii).

In 2008, Congress amended the text of the ADA "to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020). Even so, it remains the case that "[n]ot every impairment that affects an individual's major life activities is a *substantially* limiting impairment." *B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016) (cleaned up). Thus, "in assessing whether a plaintiff has a disability, [courts] have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *Id.* (emphases in original).

To demonstrate that decedent suffered from a "physical or mental impairment," plaintiffs must show the alleged impairment fits within the Equal Employment Opportunity Commission ("EEOC") regulations defining physical and mental impairments. *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 257 (E.D.N.Y. 2015) (citation omitted). Impairments are defined by the EEOC as:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological,

> musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or
> (2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

Plaintiffs allege that decedent suffered from seizures "for many years," and that these seizures "caused him to lose consciousness and his muscles to stiffen and jerk." Compl. ¶ 19. Although these allegations are somewhat thin, they are sufficient to plausibly allege that decedent's seizure disorder amounted to a "physical or mental impairment." *See, e.g.*, *Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 600 (E.D. Va. 2015) (holding that "seizures" qualify as a "physical or mental impairment").

To demonstrate that this seizure disorder qualified as a "disability," the complaint must also plausibly allege that it substantially affected a major life activity. *Durr*, 558 F. Supp. 3d at 28 (citation omitted). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

First, plaintiffs allege decedent's seizure disorder substantially limited the major life activity of "driving." Compl. ¶¶ 19, 82. For example, plaintiffs allege that "[d]octors told [decedent] it was unsafe to drive a car," *id.* ¶ 19, and further allege this inability to drive "especially in a place like upstate New York, where public transportation is not available" prevented him from being able to care for himself. Pls.' Opp'n to County Defs.' Dkt. No. 36 at 16.

Upon review, this argument must be rejected. Courts in this Circuit have repeatedly held that "driving" is not a major life activity. *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 147 (E.D.N.Y. 2018) (collecting cases). These courts have also held that "being unable to use public transportation as an alternative to driving does not rise to the level of a *major* life activity." *Id.* at 147 (E.D.N.Y. 2018); *see also Dechberry v. N.Y.C. Fire Dep't*, 124 F. Supp. 3d 131, 152 (E.D.N.Y. 2015).

Second, plaintiffs allege that decedent's seizure disorder substantially limited his ability to "hold a job" and "certain employers would not allow him to work in case he had a seizure on the job." Compl. ¶¶ 19, 82. Notably, the ability to "work" is a major life activity. 42 U.S.C. § 12102(2)(A). However, for a disability to substantially limit the major life activity of working, the complaint must plausibly allege that the disability affected "the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and

abilities." *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 137–38 (E.D.N.Y. 2015) (citation omitted).

Upon review, plaintiffs have plausibly alleged that decedent's seizure disorder substantially limited his ability to perform "a class of jobs or a broad range of jobs." Although plaintiffs have failed to provide specifics as to precisely how decedent's seizure disorder impacted his ability to obtain and keep employment, a broad reading of plaintiffs' allegations support the reasonable inference that decedent's seizures substantially limited his ability to work. Accordingly, plaintiffs have sufficiently alleged that decedent was a qualified individual with a disability within the meaning of the Acts.

**ii. <u>Intentional Discrimination</u>**

The County defendants also argue that plaintiffs have failed to plausibly allege that the County's discrimination was intentional. County Defs.' Mem. at 17. According to them, plaintiffs' factual allegations are insufficient to demonstrate that Deputy Latic had any prior knowledge of decedent's seizure disorder and therefore any discrimination was unintentional. *Id*. at 17–18.

Upon review, this argument will be rejected. "[K]nowledge of a disability is a prerequisite to discriminating by reason of that disability." *Butchino*, 2022 WL 137721, at *10 (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)). However, plaintiffs allege that "prior to the arrival of any of the individual defendants, Ms. Howard got back online with the 911

dispatcher and informed the dispatcher that [decedent] was experiencing a seizure" and "[a] review of the dispatch log indicates that the dispatcher updated the police department with this information."  Compl. ¶¶ 28–29.

In addition, plaintiffs allege more generally that the County failed to accommodate decedent's seizure disorder by not providing "adequate training, resources, supervision, or discipline to law enforcement regarding the appropriate way of responding to individuals who exhibit the signs and symptoms of seizure disorders, including by failing to instruct officers not to restrain someone having a seizure and to keep them on the side of their body."  Compl. ¶ 85

Taken together, these allegations, which are assumed true for the purpose of a motion to dismiss, are sufficient to plausibly allege that the County's alleged conduct was intentional and that Deputy Latic was on notice of decedent's seizure disorder.  In fact, "courts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties." *Felix v. City of N.Y.*, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018) (citing *Williams v. City of N.Y.*, 121 F. Supp. 3d 354, 374–75 (S.D.N.Y. 2015)).  Accordingly, plaintiffs' claims under Title II of the

ADA and Section 504 of the Rehabilitation Act against the County (Count Four) remain for discovery.

**C. <u>State Law Claims</u>**[7]

Finally, the complaint alleges state law claims against Trooper Annarino and Deputy Latic for negligence (Count Eight), conscious pain and suffering (Count Nine), the negligent infliction of emotional distress (Count Ten), and wrongful death (Count Thirteen).

**1. <u>Negligence</u>** (Count Eight)

"Although a plaintiff is typically permitted to plead different causes of action in the alternative, other District Courts in this Circuit have held that when a plaintiff's factual allegations are only consistent with a theory of intentional conduct, negligence claims must be dismissed." *McDonald v. City of Troy,* 542 F. Supp. 3d 161, 173 (N.D.N.Y. 2021) (quoting *Rizk v. City of N.Y.*, 462 F. Supp. 3d 203, 229 (E.D.N.Y. 2020). "Following that general rule, excessive force claims premised on allegedly intentional conduct are typically not permitted to coexist with claims of common negligence." *Id.* (citing *Warr v. Liberatore*, 270 F. Supp. 3d 637, 655 (W.D.N.Y. 2017).

---

[7] The complaint alleges state law claims against AmCare for negligent hiring, training, and/or discipline (Count Seven), vicarious liability (Count Eleven), and wrongful death (Count Thirteen). The complaint also alleges claims against Paramedic Taylor for negligence (Count Eight), pain and suffering (Count Nine), the infliction of emotional distress (Count Ten), and wrongful death (Count Thirteen). AmCare and Paramedic Taylor have answered the complaint, so those claims will go to discovery.

But this rule only applies if "[n]o theory of negligence could plausibly apply to [the] alleged conduct." *Negron v. City of N.Y.*, 976 F. Supp. 2d 360, 373 (E.D.N.Y. 2013).  That is not the case here.  Plaintiffs have alleged, *inter alia*, that "[d]efendants Annarino and Latic, in seizing, restraining, and pushing [decedent] onto his back while [decedent] was experiencing a seizure, failed to perform their duties with the degree of care that a reasonably prudent and careful law enforcement officer would have used under similar circumstances." Compl. ¶ 113.

As the County defendants correctly note, these allegations overlap with "those underpinning the excessive force claims."  County Defs.' Mem. at 20.  But it is equally plausible that those facts, if true, could ultimately lead to a negligent-but-not-intentional theory of recovery.  *Cf. Negron*, 976 F. Supp. 2d at 373 (opining similarly on summary judgment).  Because it is not clear from the facts alleged in the complaint that the negligence claims cannot coexist with the claims alleging intentional conduct, plaintiffs' negligence claims against Trooper Annarino and Deputy Latic remain for discovery.[8]

---

[8]  The State defendants have not specifically argued for the dismissal of this claim.  Pls.' Opp'n to State at 7 n.2.

**2. Pain and Suffering** (Count Nine)

Under New York law, "conscious pain and suffering" is recognized as a separate cause of action.[9] "It refers to the decedent's injuries, pain and suffering prior to death, and can be brought by the estate." *Ocasio*, 513 F. Supp. 3d at 328 (citation omitted). "To state a claim for conscious pain and suffering, plaintiffs must allege that the injured party was conscious for some period of time following the [injury]." *Id.* (cleaned up).

Upon review, plaintiffs have plausibly alleged this claim. In particular, the complaint alleges that decedent 'was conscious for approximately thirty-five minutes after being shot." Compl. ¶ 117. And as determined *supra*, plaintiffs have sufficiently alleged other claims related to decedent's shooting death. Accordingly, plaintiffs' claims for conscious pain and suffering against Trooper Annarino and Deputy Latic remain for discovery.

**3. Infliction of Emotional Distress** (Count Ten)

Plaintiffs have agreed to dismiss their claim for negligent infliction of emotional distress ("NIED") against Deputy Latic. Pls.' Opp'n to County at 6 n.1. However, plaintiff oppose dismissal of their NIED claim against Trooper Annarino. Pls.' Opp'n to State at 25.

---

[9] "A plaintiff asserting a survival claim for conscious pain and suffering must show an underlying cause of action that the decedent would have been able to pursue had he survived the alleged wrongdoing." *Chamberlain v. City of White Plains*, 986 F. supp. 2d 363, 398 (S.D.N.Y. 2013) (quoting N.Y. EST. POWERS & TRUSTS LAW § 11-3.2(b)).

"To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021). "To establish the fourth element, the plaintiff generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety." *Id.* at 81 n.57.

Importantly, an emotional-distress claim can be established under two distinct theories of liability: (1) the direct duty theory or (2) the bystander theory. *Alaei v. State Univ. of N.Y. at Albany*, 2022 WL 4094450, at *9 (N.D.N.Y. Sept. 7, 2022) (citation omitted). The direct duty theory of liability exists "when a plaintiff suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." *Chinese Ams. C.R. Coal., Inc. v. Trump*, 2022 WL 1443387, at *5 (S.D.N.Y. May 6, 2022) (cleaned up). The bystander theory of liability exists "when a person is threatened with physical harm as a result of defendant's negligence, and consequently suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family." *Id.* (cleaned up).

In this case, plaintiffs are seeking recovery under the so-called "bystander theory" of liability. In support of this claim, plaintiffs have alleged that

Trooper Annarino is liable to Johnson, decedent's father, because Trooper Annarino (1) owed Johnson a duty to act as a reasonably prudent law enforcement officer under the circumstances; (2) the negligent act of Trooper Annarino "directly and proximately caused [decedent's] death"; (3) Johnson "was in the zone of danger at the time that [decedent] was shot and witnessed his tragic death," and "as a result of witnessing his son's death and standing in the direct proximity of the shooting"; and (4) Johnson "suffered emotional distress" as a result of the events. Compl. ¶¶ 122–26.

Upon review, these allegations are sufficient for the purpose of a motion to dismiss. In fact, courts have specifically recognized the bystander theory in instances where a family member was intentionally shot by a police officer while the plaintiff was in the zone of danger. *See Albert v. City of N.Y.*, 2019 WL 3804654, at *9 (E.D.N.Y. Aug. 13, 2019); *Sylvester v. City of N.Y.*, 385 F. Supp. 2d 431, 445 (S.D.N.Y. 2005). Accordingly, plaintiffs' emotional-distress claim against Trooper Annarino remains for discovery.[10]

**4. <u>Wrongful Death</u>** (Count Thirteen)

Finally, plaintiffs allege that Trooper Annarino and Deputy Latic, along with others, "individually and collectively" wrongfully caused the death of decedent. Compl. ¶¶ 138–41. Thus, according to the complaint, decedent's

---

[10] The State defendants argued that Johnson cannot establish that Trooper Annarino owed him a duty of care or that he suffered any emotional harm. *See* State Defs.' Mem. at 15. However, the State defendants have failed to provide any legal basis to support those arguments. *See id.*

minor daughter H.M.J., "the statutory distribute of [decedent's] estate, sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of her father."  *Id.* ¶ 140.

The State defendants and the County defendants seek to dismiss this claim. State Defs.' Mem. at 3; County Defs.' Mem. at 20–21.  While the State defendants do not provide any arguments in support of dismissal, *see* State Defs.' Mem., the County defendants maintain that this claim is barred by the two-year statute of limitations.  County Defs.' Mem. at 20–21.

"The lapse of a limitations period is an affirmative defense that a defendant must plead and prove."  *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).  Therefore, dismissal of a claim based on an affirmative defense at the pleading stage is warranted only if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the [claim] [is] barred as a matter of law."  *Id.* (citation omitted).

Under New York law, a two-year limitations period on a wrongful death claim begins running from the date of death.  N.Y. EST. POWERS & TRUSTS LAW § 5-4.1(1).  As relevant here, the complaint alleges that decedent died on April 16, 2019.  Because the complaint was not filed until April 11, 2022, this claim would appear to be untimely.  However, plaintiffs argue this claim is timely because the limitations period was tolled twice: *first*, by statute during

H.M.J.'s infancy; and *second*, by certain Executive Orders issued during the COVID-19 pandemic.  Pls.' Opp'n to State Defs.' Mem. at 20.

First, "[w]here a minor child seeks to bring a wrongful death claim arising from a parent's death, the child's minor status may toll the statute of limitations, but the tolling period ends when the minor child reaches the age of majority or has a guardian appointed." *Rivera v. West*, 2015 WL 8481554, at *3 (S.D.N.Y. Nov. 24, 2015) (citations omitted); *see also Hernandez v. N.Y.C. Health & Hosps. Corp.*, 585 N.E.2d 822, 825 (N.Y. 1991).

As relevant here, H.M.J., the distributee of decedent's estate, was a minor at the time of decedent's death.  Compl. ¶ 11.  Russell was not appointed as the guardian of H.M.J.'s property until November 27, 2019.  *Id.*  As such, the statute of limitations for plaintiffs' wrongful death claim did not begin to run until November 27, 2019.

This tolling of the limitations period, standing alone, would not be enough to save plaintiffs' wrongful death claim, which would have expired two years later on November 27, 2021.  However, plaintiffs' point to a second tolling of the limitations period.  According to plaintiffs, the relevant limitations period was tolled for most of the COVID-19 pandemic.

On March 20, 2020, former New York State Governor Andrew Cuomo signed Executive Order 202.8, which declared that "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or

other process or proceeding as prescribed by the procedural laws of the state . . . is hereby tolled from the date of this executive order until April 19, 2020." *Bell v. Saunders*, 2022 WL 2064872, at *4 (N.D.N.Y. June 8, 2022).  Thereafter, "[t]he Governor issued nine subsequent Executive Orders, collectively extending the first order until November 3, 2020." *Id.*

"District courts in this Circuit have agreed and found that Executive Order 202.8 and subsequent orders tolled the statute of limitations period from March 20, 2020 through November 3, 2020, a total of 228 days." *Id.* at *5 (collecting cases).  These Executive Orders effectively tolled the normal limitations period. *Cain v. Cnty. of Niagara, N.Y.*, 2022 WL 616795, at *7 (W.D.N.Y. Mar. 2, 2022).

In other words, the two-year limitations period on this wrongful death claim began running on November 27, 2019, but was paused on March 20, 2020, with only 114 days elapsed.  That pause continued until November 3, 2020, when the Executive Orders expired.  Thereafter, the clock continued to run for 524 more days until April 11, 2022, the date on which this suit was filed.  At that point, only 638 days had elapsed, shy of the 730 days available in the two-year limitations period.  Accordingly, plaintiffs' wrongful death claims against Trooper Annarino and Deputy Latic remain for discovery.

## V. CONCLUSION

AmCare and Paramedic Taylor. AmCare and Paramedic Taylor have answered plaintiffs' complaint. Dkt. No. 32. Accordingly, all of plaintiffs' claims remain against these defendants. First, the state law claims against AmCare for negligent hiring, training and/or discipline (Count Seven) and for vicarious liability (Count Eleven) remain. Second, the state law claims against Paramedic Taylor for negligence (Count Eight), pain and suffering (Count Nine), and the infliction of emotional distress (Count Ten) remain. Third, the state law claims against AmCare and Paramedic Taylor for wrongful death (Count Thirteen) remain.

The State defendants. First, the § 1983 claim against Trooper Annarino for unlawful seizure and excessive force (Count One) remains. Second, the disability claims against the State Police (Count Four) remain. Third, the state law claims against Trooper Annarino for negligence (Count Eight), pain and suffering (Count Nine), emotional distress (Count Ten), and wrongful death (Count Thirteen) remain.

The County defendants. First, the § 1983 claims against Deputy Latic for unlawful seizure and excessive force (Count Two) and failure to intervene (Count Three) remain. Second, the disability claims against the County (Count Four) remain. Third, the state law claims against Deputy Latic for

negligence (Count Eight), pain and suffering (Count Nine), and wrongful
death (Count Thirteen) remain.

Therefore, it is

ORDERED that

1.  The State defendants' motion to dismiss (Dkt. No. 29) is GRANTED in
part and DENIED in part;

2.  The County defendants' motion to dismiss (Dkt. No. 30) is GRANTED
in part and DENIED in part;

3.  Plaintiffs' ADA and Rehabilitation Act claims against Trooper
Annarino in his official capacity (Count Five) are DISMISSED;

4.  Plaintiffs' § 1983 municipal liability claim against the County (Count
Six) is DISMISSED;

5.  Plaintiffs' emotional-distress claim against Deputy Latic (Count Ten) is
DISMISSED;

6.  Plaintiffs' § 1983 substantive due process claim against Trooper
Annarino (Count Twelve) is DISMISSED;

7.  Plaintiffs' § 1983 substantive due process claim against Deputy Latic
(Count Twelve) is DISMISSED;

8.  The State Police and Trooper Annarino shall file and serve an answer
to the remaining causes of action on or before Thursday, March 16, 2023; and

9. The County and Deputy Latic shall file and serve an answer to the remaining causes of action on or before Thursday, March 16, 2023.

The Clerk of the Court is directed to terminate the pending motions and set deadlines for the filing of an answer.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated: March 2, 2023
Utica, New York.