**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**ROBBIE C. JOHNSON,** ***individually and as Administrator of the Estate of Tyler R. Johnson*****, and ASHLEY E. RUSSELL,** ***guardian on behalf of H.M.J., minor daughter of Tyler R. Johnson*****,**

**Plaintiffs,**

**vs.**

**6:22-CV-343 (MAD/MJK)**

**NEW YORK STATE POLICE and ROBERT C. ANNARINO,**

**Defendants.**

---

**APPEARANCES:** **OF COUNSEL:**

**BELDOCK LEVINE & HOFFMAN LLP** — **MARY O. CLARK, ESQ.**
99 Park Avenue, PH/26th Floor
New York, New York 10016
Attorney for Plaintiffs

**FRIEDMAN, GILBERT & GERHARDSTEIN, LLC** — **SARAH J. GELSOMINO, ESQ.**, **TERRY H. GILBERT, ESQ.**
50 Public Square, Suite 1900
Cleveland, Ohio 44113
Attorneys for Plaintiffs

**OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL** — **BRIAN W. MATULA, AAG**, **CHRISTOPHER J. HUMMEL, AAG**, **WILLIAM A. SCOTT, AAG**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

# MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On April 11, 2022, Robbie C. Johnson, as Administrator of the Estate of Tyler R. Johnson, and Ashley E. Russell, as guardian on behalf of H.M.J., the minor daughter of Tyler R. Johnson (collectively, "Plaintiffs"), commenced this litigation. *See* Dkt. No. 1. This action stems from the deadly shooting of Tyler R. Johnson ("Decedent"), a twenty-four-year-old man with a seizure disorder, on April 16, 2019, in Oneida County, New York. *See* Dkt. No. 1-8. Plaintiffs originally alleged thirteen claims against six defendants. *See id.* At this juncture, however, only New York State Trooper Robert C. Annerino and the New York State Police ("NYSP") (collectively, "Defendants") remain as Defendants. *See* Dkt. Nos. 93, 109. All parties are counseled.

Defendants filed a motion to dismiss, *see* Dkt. No. 29, which was partially granted on March 2, 2023, *see* Dkt. No. 44 at 52. The following claims against them remained: (1) unlawful seizure and excessive force, pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution, against Defendant Annarino in his individual capacity; (2) violation of the Rehabilitation Act of 1973 ("RA") and Title II of the Americans with Disabilities Act of 1990 ("ADA"), against NYSP; (3) negligence, against Defendant Annarino in his individual capacity; (4) pain and suffering, against Defendant Annarino in his individual capacity; (5) negligent infliction of emotional distress ("NIED"), against Defendant Annarino in his individual capacity; and (6) wrongful death, against Defendant Annarino in his individual capacity. *See id.* at 51-52; Dkt. No. 1-8 at ¶¶ 67-69, 78-92, 110-27, 138-41.

Presently before the Court is Defendants' motion for summary judgment dated November 14, 2025, Plaintiffs' response in opposition, and Defendants' reply.[1] *See* Dkt. Nos. 99, 107, 112. For the following reasons, Defendants' motion is granted in part and denied in part.

---

[1] In their reply papers, Defendants urge the Court to disregard two expert reports that Plaintiffs filed with their opposition brief because they "are not in the form of a declaration or affirmation[.]" Dkt. No. 112 at 8. "[C]ourts in the Second Circuit have consistently held that

## II. BACKGROUND

The following facts are derived from Plaintiffs' response to Defendants' statement of material facts, which restates Defendants' factual allegations. *See* Dkt. No. 107-2. In that same filing, Plaintiffs provide a statement of additional material facts in dispute.[2] *See id.* at 44-59.

On March 5, 2019, Decedent conducted internet searches about how to kill himself. *See id.* at 1, ¶ 1. On April 16, 2019, between 5:39 P.M. and 6:46 P.M., he texted his ex-girlfriend and the mother of his child, Plaintiff Russell, several messages suggesting he wanted to die. *See id.* at 2, ¶¶ 3-5. At around 6:50 P.M. that same day, Decedent posted on Facebook: "God please take my life now, I can't deal with it anymore I just want to be with my loved ones in heaven[,]" and texted his sister, Ashley Johnson, about his post. *Id.* at 3, ¶¶ 6-7.

Upon reading Decedent's text message, Ashley Johnson called Decedent's father, Plaintiff Robbie Johnson. *See id.* at 3, ¶ 8. Plaintiff Robbie Johnson then drove with his friend, Melissa Howard, to the home where he and Decedent lived to check on Decedent. *See id.* at 3-4, ¶ 10. At 7:05 P.M., Plaintiff Robbie Johnson and Howard arrived and found Decedent's bedroom door shut and Decedent unresponsive. *See id.* at 4, ¶ 11. Defendants and Plaintiffs dispute how Plaintiff

---

unsworn expert reports do not satisfy the admissibility requirements of [Federal Rule of Civil Procedure] 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." *Hollman v. Cnty. of Suffolk*, No. 06-CV-3589, 2011 WL 2446428, *13 (E.D.N.Y. June 15, 2011) (citation and internal quotation marks omitted); *see also Mid-Town Laundry, LLC v. Pierce*, No. 1:17-CV-338, 2021 WL 2417672, *8 (N.D.N.Y. June 14, 2021) (explaining that courts in the Second Circuit "have uniformly held that unsworn expert reports . . . cannot be used [on] a motion for summary judgment without additional affidavit support"); *Sharif v. Fischer*, No. 05-CV-6504, 2025 WL 1220295, *11 (W.D.N.Y. Apr. 28, 2025); *Reza v. Khatun*, No. 09-CV-233, 2017 WL 3172816, *2 (E.D.N.Y. July 25, 2017) (collecting cases). Because neither of Plaintiffs' expert reports appear to have the necessary sworn support, the Court declines to consider them. *See* Dkt. Nos. 107-11, 107-15.

[2] Because Plaintiffs' statement of additional material facts in dispute restarts the paragraph numbering from 1, citations to docket item 107-2 include page and paragraph numbers.

Robbie Johnson opened the bedroom door and whether the door was stuck or locked from the inside. *See id.* at 4, ¶¶ 11-12. Defendants and Plaintiffs also dispute how Plaintiff Robbie Johnson and Howard responded to finding Decedent unresponsive: Defendants assert that the two yelled at and shoved Decedent, while Plaintiffs contend that Plaintiff Robbie Johnson witnessed Decedent having a seizure and calmly comforted him "like medical professionals had instructed him to do[.]" *Id.* at 5, ¶ 14.

At 7:09 P.M., Howard called 911 and informed the dispatcher that there was a "possible overdose," that Decedent was breathing but nonresponsive, and that Decedent had a seizure disorder. *Id.* at 6, ¶ 17. The 911 dispatcher requested support from emergency personnel and informed them Decedent was unconscious, suffering a possible overdose, and had a seizure disorder. *See id.* at 6, ¶ 18. At 7:14 P.M., Defendant Annarino responded to the call. *See id.* at 6, ¶ 19. Howard called 911 again at 7:15 P.M. and told the dispatcher that Decedent had previously said he was going to kill himself, which the dispatcher relayed to emergency personnel. *See id.* at 6-7, ¶¶ 20-21.

At approximately 7:20 P.M., Defendant Annarino arrived at the home to secure the area for medical personnel to enter. *See id.* at 7, ¶¶ 23-24. Defendants and Plaintiffs dispute Decedent's physical positioning when Defendant Annarino arrived in Decedent's bedroom: Defendants assert that Decedent was "on his bed, lying on his stomach, with his hands out of sight, but appearing to be under his upper body[,]" while Plaintiffs aver that Decedent was lying on his left side facing the bedroom door with his hands visible and fists clenched over his chest. *Id.* at 8, ¶ 27. The parties also dispute whether Decedent was shaking: Defendants assert that he was not, but Plaintiffs assert that he was. *See id.* at 9, ¶ 31. Plaintiffs contend that Plaintiff Robbie Johnson told Defendant Annarino that Decedent was having a seizure, rather than

suffering from an overdose. *See id.* at 8-9, ¶ 29; *see also id.* at 47, ¶ 27. Plaintiffs state that when Defendant Annarino arrived, Plaintiff Robbie Johnson was tending to Decedent. *See id.* at 9, ¶ 31; *see also id.* at 45, ¶¶ 5-6.

Defendant Annarino told Plaintiff Robbie Johnson to leave Decedent's bedroom, but the parties dispute whether he complied: Defendants contend that Defendant Annarino directed him out of the bedroom and that Plaintiff Robbie Johnson went to the living room of the house, but Plaintiffs assert that Plaintiff Robbie Johnson felt himself be pushed backwards and "stood at the bedroom doorway observing [Decedent] until after the shooting" with Ashley Johnson. *Id.* at 9-10, ¶¶ 32-34. Defendants and Plaintiffs dispute whether Defendant Annarino was ever alone with Decedent: Defendants assert that he was, but Plaintiffs argue that he was never alone with Decedent because Plaintiff Robbie Johnson remained at the bedroom doorway. *See id.* at 10, ¶ 34.

The parties agree that Defendant Annarino initially used non-lethal force on Decedent, but they disagree on how he physically handled him. *See id.* at 10-11, ¶¶ 35-36. Defendants state that "Annarino used his right hand on Decedent's right shoulder and left hand on his hip in an effort to roll Decedent away from him" to "determine whether Decedent had anything in his hands which would pose a danger to responding medical staff." *Id.* Plaintiffs assert that Defendant Annarino grabbed Decedent "roughly by the shoulders . . . and started shaking him" and that Decedent's hands were visible to Defendant Annarino. *Id.* Defendants assert that Defendant Annarino felt Decedent resisting his efforts to roll him over. *See id.* at 11, ¶ 37. Plaintiffs restate that Defendant Annarino did not attempt to roll Decedent, and instead roughly grabbed him by the shoulders, "'picked him up[,]' and 'started shaking him[.]'" *Id.*

Defendants assert that at 7:20 P.M., Defendant Annarino radioed for medical personnel to come and help him roll Decedent. *See id.* at 11, ¶ 38. Paramedic Paul Taylor entered Decedent's bedroom, but Plaintiffs assert that Defendant Annarino never requested assistance with rolling Decedent. *See id.* at 11-13, ¶¶ 38-39. Rather, Plaintiffs claim Paramedic Taylor entered after receiving a message that the home was secured. *See id.* Defendants and Plaintiffs dispute the position in which Decedent was lying when Paramedic Taylor arrived: Defendants assert that "Decedent was on his bed and face down with his hands under his body, believed to be near his chest or chin[,]" while Plaintiffs assert that Decedent was still lying on his left side "until Annarino positioned Tyler on his back." *Id.* at 13-14, ¶ 40. Defendants then aver that Defendant Annarino and Paramedic Taylor attempted to roll Decedent over. *See id.* at 14, ¶ 41. Plaintiffs argue that Plaintiff Robbie Johnson never saw Paramedic Taylor touch or provide care to Decedent before the shooting, and that Defendant Annarino alone roughly grabbed Decedent by the shoulders and shook him. *See id.*

Defendants contend that "[i]n the process of rolling Decedent onto his back, [Defendant] Annarino saw that Decedent was clenching a knife, with the point of the knife near the base of Decedent's own neck." *Id.* at 15-16, ¶ 45. Plaintiffs assert that Decedent was not holding a knife. *See id.*; *see also id.* at 46, ¶¶ 14-15 (noting that before first responders arrived, Plaintiff Robbie Johnson slid his hands between Decedent's palms and found nothing in his hands); *id.* at 52, ¶ 67 (noting that before first responders arrived, Ashley Johnson did not see anything in Decedent's clenched hands); *id.* at 53-54, ¶¶ 81-82, 95 (noting that after first responders arrived, Ashley Johnson did not see any weapons near Decedent or in his hands). Decedent then awoke and yelled something to the effect of, "What the fuck!" *Id.* at 16-17, ¶¶ 48-49.

Defendants and Plaintiffs dispute whether Defendant Annarino yelled about Decedent having a knife: Defendants assert that he "yelled 'Knife' or 'He has a knife[,]'" while Plaintiffs assert that Plaintiff Robbie Johnson never heard Defendant Annarino say Decedent had a knife. *Id.* at 17, ¶ 50. Plaintiffs also assert that Ashley Johnson heard Defendant Annarino say, "knife," but did not hear him say that Decedent had a knife. *Id.* According to Plaintiffs, Ashley Johnson's partner, Sara Walker, was nearby and heard Defendant Annarino say that Decedent had a knife. *See id.* at 55, ¶ 115.

Defendants assert that Paramedic Taylor, who was standing at the foot of the bed, "looked toward Decedent's hands and saw the knife in Decedent's hands." *Id.* at 17-18, ¶ 51. The parties dispute whether Decedent attempted to kick Paramedic Taylor. *See id.* at 15, ¶ 44. Plaintiffs assert that other individuals near the scene—Plaintiff Robbie Johnson, Ashley Johnson, Walker, and Oneida County Sheriff's Deputy Emrah Latic—never saw Decedent holding a knife. *See id.* at 17-18, ¶ 51.

The parties agree that Defendant Annarino yelled for medical personnel to exit the room. *See id.* at 18, ¶ 52. They agree that Paramedic Taylor did not leave, although they dispute whether he refused to exit the room or was blocked from doing so. *See id.* at 18, ¶ 55. The parties dispute whether Paramedic Taylor stood back at the end of the room farthest from the bed, or whether he stood behind Defendant Annarino and grabbed onto his vest. *See id.* at 19, ¶¶ 56-57. Defendants contend that Defendant Annarino, who was wearing gloves, grabbed the blade of the knife, but Plaintiffs maintain that Decedent was not holding a knife. *See id.* at 19, ¶ 58. The parties dispute whether Defendant Annarino and Decedent struggled for control of the knife. *See id.* Defendants contend that Defendant Annarino believed Decedent would try to stab him with the knife, but again, Plaintiffs maintain that Decedent was not holding a knife. *See id.* at 21-22, ¶

63. The parties agree that Defendant Annarino then yelled about a knife, but they dispute whether he ordered Decedent to drop a knife. *See id.* at 22, ¶ 64.

Next, the parties dispute whether Decedent began to lift himself off the bed. *See id.* at 22-23, ¶ 65. Defendants contend that Decedent got up on his feet while on the bed, but Plaintiffs contend that he never stood. *See id.* at 23, ¶ 66. According to Plaintiffs, Deputy Latic saw Decedent on "all fours" on the bed, supporting himself on his forearms and knees, and Defendant Annarino "was in a higher position" than Decedent. *Id.* Defendants assert that Decedent grabbed at Defendant Annarino's duty belt, which contained pepper spray, a taser, and a gun, but Plaintiffs argue that Decedent never made any purposeful movements toward Defendant Annarino. *See id.* at 23-24, ¶ 67. Defendants argue that Defendant Annarino then let go of the knife to stop Decedent from grabbing his duty belt. *See id.* at 24, ¶ 68.

After Defendant Annarino lost his grip on the knife, Defendants contend that Decedent repeatedly tried to stab Defendant Annarino from above. *See id.* at 25-26, ¶ 70. Plaintiffs state that Decedent never had a knife, stood on the bed, or tried to stab Defendant Annarino. *See id.* Defendants argue that Defendant Annarino used his left hand to push Decedent's right shoulder down and away from him. *See id.* at 26, ¶ 71. According to Plaintiffs, at that time, Decedent was still on all fours on the bed with Deputy Latic holding his legs. *See id.* at 26-27, ¶ 72. Defendants assert that Decedent was overpowering Defendant Annarino, who could not back away because Paramedic Taylor was grabbing his vest from behind. *See id.* at 27-28, ¶¶ 73, 75. Plaintiffs argue that Decedent, in his restrained position, could not have overpowered Defendant Annarino. *See id.* at 27, ¶ 73. Defendants argue that Defendant Annarino then saw Decedent swing his arm in an attempt to stab Defendant Annarino. *See id.* at 28, ¶ 76. Plaintiffs again dispute whether Decedent had a knife. *See id.*

According to Defendants, after Decedent swung the knife, Defendant Annarino shot at Decedent. *See id.* at 29, ¶ 77. They assert that Decedent was elevated above Defendant Annarino when Defendant Annarino fired the first shot. *See id.* Plaintiffs argue again that Decedent did not have a knife, stand up, or attempt to stab Defendant Annarino. *See id.* The parties dispute whether Defendant Annarino fired the gun from his hip or whether his arms were extended straight out in front of him. *See id.* at 29-30, ¶ 79. Defendants assert that Defendant Annarino did not know, at that time, whether any bullets struck Decedent. *See id.* at 30, ¶ 81.

Defendants state that as Defendant Annarino shot the gun, Decedent left the bed. *See id.* at 30-31, ¶ 82. Defendant Annarino was unsure whether Decedent fell off the bed or was intentionally advancing toward him. *See id.* at 31, ¶ 83. Defendant Annarino continued shooting at Decedent. *See id.* at 30-31, ¶ 82. Plaintiffs maintain that Decedent never advanced toward Defendant Annarino; rather, he fell to the floor after he was shot. *See id.* at 30-31, ¶¶ 82-83. Defendants assert that Decedent landed on the floor with the knife, which Plaintiffs again dispute. *See id.* at 31-32, ¶ 84. The parties dispute whether Decedent tried to get up from the floor. *See id.* They agree that Defendant Annarino fired seven shots total, *see id.* at 32, ¶ 85, but they dispute how quickly all seven shots were fired, *see id.* at 37, ¶ 96.

After Decedent fell to the floor, the parties do not dispute that Deputy Latic picked up a knife from under Decedent's leg and placed it on the bed.[3] *See id.* at 33-34, ¶ 88. However, Plaintiffs again emphasize that Decedent was never holding a knife and never made a purposeful movement toward Defendant Annarino. *See id.*; *see also id.* at 50-51, ¶¶ 58-59 (stating that

---

[3] Defendants provided the Court with Deputy Latic's body camera footage, which the Court has reviewed. *See* Dkt. No. 99-9. The footage begins with Defendant Annarino standing over Decedent, who is lying on the floor in the doorway of the bedroom. The footage does not show the use of force; the recording begins post-shooting.

Plaintiff Robbie Johnson knew Decedent had a jackknife collection, was familiar with the collection, and did not recognize the knife at the scene). According to Plaintiffs, Deputy Latic first saw the knife as it fell to the floor. *See id.* at 54, ¶ 104. Although Defendants state that Defendant Annarino believed shooting Decedent was his final option, Plaintiffs assert that he could have used de-escalation techniques and non-lethal force, such as the pepper spray or taser on his duty belt. *See id.* at 34-35, ¶ 90.

The parties agree that after Decedent collapsed on the floor, his head was positioned somewhere near the bedroom door. *See id.* at 37, ¶ 97. However, while Defendants contend that Decedent's head was just past the threshold between the hallway and the bedroom, Plaintiffs argue that Decedent's head came to rest at the feet of Plaintiff Robbie Johnson, who was standing in the bedroom doorway. *See id.* The parties dispute whether Plaintiff Robbie Johnson expressed a belief that Decedent was dead immediately after being shot. *See id.* at 39, ¶ 103. They also dispute whether Decedent visibly moved or breathed after he fell to the floor. *See id.* at 40, ¶ 104.

The parties do not dispute that Defendant Annarino radioed for medical personnel to enter the house at 7:24 P.M. *See id.* at 40, ¶ 107. They agree that within approximately two minutes of the shooting, Decedent was unconscious, pulseless, and not breathing. *See id.* at 40, ¶ 108. They agree that Decedent did not regain consciousness after the shooting. *See id.* at 41, ¶ 109. Decedent was declared dead at Rome Memorial Hospital at 8:02 P.M. *See id.* at 41, ¶ 111; *see also* Dkt. No. 99-39. The parties agree that Decedent's death certificate states that he died "seconds" after being shot. *See* Dkt. No. 107-2 at 40, ¶ 105; *see also* Dkt. No. 99-39.

The parties disagree over whether Decedent was injured during Defendant Annarino's use of non-lethal force. *See* Dkt. No. 107-2 at 41-42, ¶¶ 112-13. Defendants argue that Decedent was not hurt, but Plaintiffs argue that Decedent sustained abrasions and bruising to his forehead, arms,

right wrist, and right hand, as well as emotional distress and fear as Defendant Annarino grabbed and shook him. *See id.*

Furthermore, Defendants argue that nobody asked Defendant Annarino or other Troopers to provide Decedent with any kind of disability accommodation. *See id.* at 42, ¶ 114. In response, Plaintiffs argue that Howard told the 911 dispatcher about Decedent's seizure disorder and that he was having a seizure, and Plaintiff Robbie Johnson told Defendant Annarino multiple times that Decedent was having a seizure. *See id.* The parties agree that around the time of his death, Decedent performed "assorted jobs" on a cash basis. *Id.* at 43, ¶ 117. While Defendants argue that there is no record of Decedent's seizure disorder affecting his employability, Plaintiffs contend that Decedent struggled to keep a job because others thought his condition made him a liability. *See id.* at 43, ¶ 118.

Although the parties agree that Plaintiff Robbie Johnson did not see Defendant Annarino point the gun at him, Plaintiff Robbie Johnson testified that the gun was closer to him than to Decedent. *See id.* at 35-36, ¶ 92. Plaintiffs assert that Plaintiff Robbie Johnson feared for his life because the gun was close to him and he was unsure what Defendant Annarino would do next. *See id.* Paramedic Taylor also stated that he believed his life was in danger, but according to Paramedic Taylor, Defendant Annarino's actions saved his life. *See id.* at 38-39, ¶ 101.

Finally, the parties agree that Plaintiff Robbie Johnson is Decedent's only duly appointed personal representative. *See id.* at 44, ¶ 121.

## III. DISCUSSION

### A. Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (citations and internal quotation marks omitted). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the movant meets its initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**B. Ashley Russell as a Plaintiff**

Defendants argue that all claims by Plaintiff Russell should be dismissed because she is not Decedent's duly appointed representative. *See* Dkt. No. 99-1 at 29-30. The complaint

identifies Plaintiff Russell as the mother of Decedent's minor daughter, who is a distributee of his estate. *See* Dkt. No. 1-8 at ¶ 11. Plaintiff Russell does not appear to assert any claims on her own behalf. *See generally* Dkt. No. 1-8. The complaint alleges that Plaintiff Russell "was appointed by the Surrogate's Court of Oneida County as a guardian of the property of [their daughter] on November 27, 2019." *Id.* at ¶ 11. It also alleges that she consented to the appointment of Plaintiff Robbie Johnson as Administrator of Decedent's estate. *See id.* As explained herein, all remaining claims are asserted on behalf of Decedent, his estate, or Plaintiff Robbie Johnson. Accordingly, the Court construes Decedent's daughter's involvement in this matter as limited to her status as a distributee of his estate.

Post-discovery, it is undisputed that Plaintiff Robbie Johnson is Decedent's only duly appointed personal representative. *See* Dkt. No. 107-2 at 44, ¶ 121; Dkt. No. 99-38. Defendants therefore argue that only Plaintiff Robbie Johnson, as Administrator of Decedent's estate, has standing to sue on the remaining claims brought on behalf of Decedent or his estate. *See* Dkt. No. 99-1 at 30 (citing N.Y. EST. POWERS & TRUSTS LAW § 5-4.1). Plaintiffs' opposition papers do not respond to this argument. *See* Dkt. No. 107-1; Dkt. No. 112 at 4.

"Only a duly appointed personal representative may bring suit on behalf of a decedent in New York." *Garmon v. Cnty. of Rockland*, No. 10-CV-7724, 2013 WL 541380, *3 (S.D.N.Y. Feb. 11, 2013) (citation and internal quotation marks omitted). This rule applies to wrongful death claims, which the personal representative may bring on behalf of the decedent's distributees. *See In re Sept. 11 Litig.*, 760 F. Supp. 2d 433, 443-44 (S.D.N.Y. 2011) (citing N.Y. EST. POWERS & TRUSTS LAW § 5-4.1). Under New York law, "'[a] personal representative is a person who has received letters to administer the estate of a decedent.'" *Garmon*, 2013 WL 541380, at *3 (quoting N.Y. EST. POWERS & TRUSTS LAW § 1-2.13); *see also Hartke v. Bonhams & Butterfields*

*Auctioneers Corp.*, No. 22-CV-3571, 2023 WL 8551889, *6 (S.D.N.Y. Dec. 11, 2023); FED. R. CIV. P. 17(b). Therefore, the Court grants Defendants' motion on all claims as to Plaintiff Russell and orders her terminated from this action.

**C. Fourth Amendment Excessive Force**

Plaintiffs' complaint alleges that Defendant Annarino used excessive force when he grabbed Decedent's shoulders and forcefully attempted to push Decedent onto his back—despite knowing that Decedent was having a medical emergency—and shot Decedent. *See* Dkt. No. 1-8 at ¶¶ 36, 44, 54-56, 67-69. Plaintiffs also appear to allege that at least some of this conduct constituted an unlawful seizure. *See id.* at ¶ 68. Defendant Annarino argues that he is entitled to summary judgment on this claim because his use of lethal force was objectively reasonable. *See* Dkt. No. 99-1 at 8-14. He also argues that the non-lethal force was *de minimis*, incident to his efforts to secure the scene for medical personnel, and not a Fourth Amendment violation. *See id.* at 14-16. In opposition, Plaintiffs argue that there are genuine issues of material fact, and a reasonable jury could find Defendant Annarino's use of lethal and non-lethal force objectively unreasonable. *See* Dkt. No. 107-1 at 8-17.

According to the Supreme Court, "[a] police officer's use of deadly force violates the Fourth Amendment when it is not 'objectively reasonable.'" *Barnes v. Felix*, 605 U.S. 73, 76 (2025) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Est. of JLA v. Fike*, No. 5:22-CV-287, 2026 WL 1998796, *4 (N.D.N.Y. July 10, 2026). When determining objective reasonableness, courts must analyze the totality of the circumstances from the perspective of a reasonable officer on the scene. *See Barnes*, 605 U.S. at 76, 79 (citations omitted); *Est. of JLA*, 2026 WL 1998796, at *4. "[C]ourt[s] must consider all the relevant circumstances, including facts and events leading up to the [use of deadly force]." *Barnes*, 605 U.S. at 76. Courts also rely

on the objective reasonableness analysis where the police seize someone through non-lethal force. *See Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also* Dkt. No. 44 at 17 n.4. Accordingly, the Court analyzes the Fourth Amendment claim against Defendant Annarino under the objective reasonableness standard.

"The 'proper application' of this standard 'requires careful attention to the facts and circumstances of each particular case, including the severity of the [conduct] at issue [and] whether the [individual] pose[d] an immediate threat to the safety of the officers or others . . . .'" *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) (quoting *Graham*, 490 U.S. at 396). Courts in this Circuit also consider:

> the need for the application of force[,] . . . the relationship between the need and the amount of force that was used[,] . . . the extent of the injury inflicted[,] and . . . whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Loveall v. Walker*, 807 F. Supp. 3d 148, 159 (N.D.N.Y. 2025) (quoting *Linton v. Zorn*, 135 F.4th 19, 31 (2d Cir. 2025)). The reasonableness determination must consider the fact that law enforcement officers often are forced to make quick decisions under stressful and rapidly evolving circumstances. *See Graham*, 490 U.S. at 396-97.

***1. Non-Lethal Force***

Defendant Annarino argues that his use of non-lethal force was objectively reasonable as a matter of law because the contact was momentary and occurred in Decedent's home, the contact was a part of Defendant Annarino's reasonable attempt to secure the scene for emergency medical assistance, and the contact did not cause any injury. *See* Dkt. No. 99-1 at 14-16. Defendant Annarino also argues that his conduct did not constitute an unlawful seizure. *See id*. at 15. Plaintiffs aver that the use of non-lethal force was objectively unreasonable in light of Decedent's

medical emergency and that none of the reasonableness factors support Defendant Annarino's use of non-lethal force. *See* Dkt. No. 107-1 at 8-10.

Although the parties do not dispute that Defendant Annarino physically touched Decedent as he was lying on the bed, *see* Dkt. No. 107-2 at 10, ¶ 35, there is a material dispute of fact concerning the nature of that physical contact, *see id.* For example, Defendant Annarino testified at deposition that he tried to roll Decedent over by placing his hands on his hip and shoulder, and that he verbally tried to rouse Decedent. *See* Dkt. No. 99-25 at 25:20-24, 26:1-6.[4] In contrast, Plaintiff Robbie Johnson testified that he saw Defendant Annarino pick Decedent up off the bed, grab him "roughly like by the shoulders[,]" and shake him. Dkt. No. 107-5 at 32:21-25, 33:2-3. Plaintiff Robbie Johnson also testified that while Defendant Annarino shook Decedent, Plaintiff Robbie Johnson yelled that Decedent was having a seizure. *See id.* at 32:23-25.

The parties also contest whether Decedent's hands were visible when Defendant Annarino entered the bedroom, which reveals a genuine dispute of material fact concerning whether the use of non-lethal force was reasonable as a means of securing the area. *See* Dkt. No. 107-2 at 14, ¶ 42. Defendant Annarino testified that Decedent's hands were hidden under his body, *see* Dkt. No. 99-25 at 28:20-24, 29:1-7, but other witnesses testified that Decedent's hands were visible and empty while Decedent was lying on the bed, *see* Dkt. No. 107-5 at 23:4-7, 29:14-25, 30:2-24; Dkt. No. 107-6 at 19:17-18; Dkt. No. 107-7 at 6:14-19.

Finally, Plaintiffs point to the medical examiner's report as evidence that Decedent was injured during the use of non-lethal force. *See* Dkt. No. 107-2 at 41, ¶ 112. The report indicates that Decedent sustained blunt force trauma at some point, including bruising and abrasions on his

---

[4] Deposition page numbers correspond with the court-created Bates numbers on each docket entry.

head and body. *See* Dkt. No. 104-14 at 9.

Given the disputes of fact concerning the nature of the physical contact, Defendant Annarino's understanding that Decedent may have been mid-seizure at the time, and whether Decedent's hands were visible when Defendant Annarino used non-lethal force, it is possible that a jury could find Defendant Annarino's use of non-lethal force unreasonable. *See Fera v. City of Albany*, 568 F. Supp. 2d 248, 254 (N.D.N.Y. 2008) ("Officers' awareness of information about a [person's] vulnerability due to a medical condition obviously is a circumstance that is relevant to the reasonableness of a particular use of force"); *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (vacating the district court's finding of summary judgment for a police officer who shot and injured an unarmed person, and emphasizing that the court must draw all reasonable inferences in the nonmoving party's favor on a motion for summary judgment). The Court declines to opine on whether the non-lethal use of force was *de minimis*, as such a determination would impermissibly require the Court to choose one party's factual narrative over the other.

Defendants' motion for summary judgment on the Fourth Amendment claim is denied as to the alleged use of non-lethal force.

***2. Lethal Force***

Defendant Annarino argues that his use of lethal force was objectively reasonable as a matter of law because he believed "Decedent posed a significant threat of death or serious physical injury to Trooper Annarino and to Paramedic Taylor." Dkt. No. 99-1 at 8 (internal quotation marks omitted). By Defendant Annarino's account, Decedent resisted his attempts to roll Decedent onto his back, held a knife in his hands that he refused to drop, struggled with Defendant Annarino over control of the knife, rose above him on the bed, grabbed at his duty belt, and "actively stabb[ed]" at Defendant Annarino with the knife. *Id.* at 9-10. Defendant Annarino

also asserts that he was unable to push Decedent away from him. *See id*. at 10. Plaintiffs assert that these facts—which are material to whether Defendant Annarino's use of lethal force was reasonable—are disputed and therefore preclude summary judgment. *See* Dkt. No. 107-1 at 10-17. Plaintiffs contend that Decedent "did not pose a threat to the safety of any person so as to justify Annarino's use of lethal force." *Id.* at 15.

The Supreme Court has stated that deadly force may be objectively reasonable where "a dangerous, obviously unstable person [is] making threats [with] a weapon involved." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015). District courts have made similar observations. *See, e.g.*, *Bernazard v. Koch*, No. 15-CV-642, 2018 WL 1247379, *5 (E.D.N.Y. Mar. 8, 2018) ("The law is clear that when a [person] threatens an officer with a weapon, the officer may use deadly force in response"); *Est. of Jackson v. City of Rochester*, 705 F. Supp. 779, 781, 783 (W.D.N.Y. 1989) (concluding that it was objectively reasonable for a police officer to use deadly force in self-defense when the decedent lunged at him with a knife); *Biggs v. City of New York*, No. 08-CV-8123, 2010 WL 4628360, *5-6 (S.D.N.Y. Nov. 16, 2005) (determining that a police officer's use of deadly force was objectively reasonable because the decedent was brandishing a knife in close proximity to the officer).

Here, however, the parties dispute the circumstances so fundamentally that the Court cannot conclude, as a matter of law, whether Defendant Annarino's use of deadly force was reasonable. As described above, the parties dispute whether Decedent ever had a knife in his hands, got up from the bed, attempted to stab Defendant Annarino, or grabbed at Defendant Annarino's duty belt. *Compare* Dkt. No. 99-25 at 31:11-12, 36:11-16, 38:14-18, 40:1-11, 68:22-24, 76:3-13 (Defendant Annarino testifying that he saw Decedent holding a knife, tried to grab the knife from Decedent, struggled with Decedent over control of the knife, saw Decedent get up

from the bed, and saw Decedent grab at his duty belt, which had pepper spray on it), *and* Dkt. No. 99-23 at 2 (Paramedic Taylor stating, on the night of the incident, that he felt his life was in grave danger and Defendant Annarino saved his life), *with* Dkt. No. 107-5 at 30:8-19, 70:8-19 (Plaintiff Robbie Johnson testifying that Decedent did not have anything in his hands shortly before the shooting, Decedent never made any purposeful physical movement toward Defendant Annarino, and Decedent never got up on his feet), Dkt. No. 107-6 at 30:2-3 (Ashley Johnson testifying that she saw no weapon in Decedent's hands before Defendant Annarino shot him), *and* Dkt. No. 99-17 at 6 (Ashley Johnson stating, a few hours after the incident, that Decedent awoke from his seizure and slowly sat up before Defendant Annarino shot him).

These disputes of fact make it improper to grant Defendants' motion on this issue. Accordingly, Defendants' motion is also denied on this portion of the Fourth Amendment claim.[5]

**D. Wrongful Death**

To successfully assert a wrongful death claim, "'a plaintiff must prove . . . (1) a death, (2) caused by the wrongful conduct of a defendant, (3) that gives rise to a cause of action which could have been maintained, at the moment of death, by the decedent if death had not ensued.'" *O'Brien v. City of Syracuse*, No. 22-CV-948, 2025 WL 1519411, *29 (N.D.N.Y. 2025) (quoting *Santos v. City of New York*, No. 20-CV-6091, 2023 WL 5756513, *3 (E.D.N.Y. Mar. 13, 2023), *R. & R. adopted*, 2023 WL 5759185 (E.D.N.Y. Sept. 6, 2023)). The plaintiff must also show "the survival of distributees who suffered pecuniary loss by reason of the decedent's death[] and . . . the

[5] Defendant Annarino also argues that he is entitled to qualified immunity. *See* Dkt. No. 99-1 at 16. To determine whether qualified immunity applies, the Court must decide whether Defendant Annarino violated Decedent's clearly established constitutional rights. *See Est. of JLA v. Fike*, No. 5:22-CV-287, 2025 WL 3132302, *8 (N.D.N.Y. Nov. 10, 2025), *reconsideration denied*, 2026 WL 1998796 (N.D.N.Y. July 10, 2026) (citations omitted). As explained herein, material disputes of fact prevent the Court from making that determination at this juncture.

appointment of a personal representative of the decedent." *Burch v. City of New York*, No. 11-CV-2841, 2016 WL 11430773, *19 (E.D.N.Y. Apr. 22, 2016) (citation and internal quotation marks omitted). Where a party raises "an issue of fact as to whether the defendant officer[] used excessive force and whether that force caused [the decedent's] death, [that party] has also raised a triable issue as to the second element of a wrongful death claim[.]" *Id.* (citing *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 250 (E.D.N.Y. 2014)).

Defendants challenge Plaintiffs' proof of the second element on the theory that Defendant Annarino's deadly shooting of Decedent was justified. *See* Dkt. No. 99-1 at 16-17. Plaintiffs counterargue that genuine disputes of material fact prevent the Court from making such a finding. *See* Dkt. No. 107-1 at 19-20. For the reasons explained above with respect to the Fourth Amendment claim, the Court agrees with Plaintiffs and denies Defendants' motion on the wrongful death claim.

**E. Conscious Pain and Suffering**

Plaintiffs allege that Defendant Annarino is liable for pain and suffering that Decedent consciously experienced. *See* Dkt. No. 1-8 at ¶¶ 116-19. Defendant Annerino asserts that he is entitled to summary judgment because "Plaintiffs fail to establish a genuine issue of material fact as to whether Decedent was conscious or had any level of cognitive awareness following [the shooting.]" Dkt. No. 99-1 at 20. In opposition, Plaintiffs argue that the post-shooting body camera video and Defendant Annarino's testimony indicate "factual issues regarding whether and for how long [Decedent] was 'conscious or partially conscious between the time of injury and the time of death[.]'" Dkt. No. 107-1 at 23 (quoting *Santos*, 2023 WL 5756513, at *3).

"A claim for 'conscious pain and suffering' runs in tandem with a wrongful-death claim." *Santos*, 2023 WL 5756513, at *3 (citation omitted). "In order to prevail on a conscious pain and

suffering claim, a plaintiff must prove that the decedent was conscious or partially conscious between the time of the injury and the time of death and that he suffered . . . physical or mental pain during that period of consciousness." *Id.* (citing *Dullard v. Berkeley Assocs. Co.*, 606 F.2d 890, 894-95 (2d Cir. 1979)); *see also Carroll ex rel. Est. of Hill v. United States*, No. 23-CV-549, 2026 WL 2395364, *12 (W.D.N.Y. July 9, 2026), *R. & R. adopted*, 2026 WL 2395323 (W.D.N.Y. Aug. 13, 2026) (citing *Cummins v. Cnty. of Onondaga*, 84 N.Y.2d 322, 324-25 (1994)). The plaintiff must also show "that the decedent died in connection with the alleged injuries." *Santos*, 2023 WL 5756513, at *3 (citations omitted); *see Carroll*, 2026 WL 2395364, at *12 (citation omitted).

Because the shooting is the only deadly force alleged, and Plaintiffs must plead that Decedent "died in connection with the alleged injuries" to sustain a conscious pain and suffering claim, *Santos*, 2023 WL 5756513, at *3; *see Carroll*, 2026 WL 2395364, at *12, the Court construes this claim as relying on Decedent's condition during and after the shooting. Despite the original allegation in Plaintiffs' complaint that Decedent remained conscious for more than half an hour after the shooting, they do not dispute Defendants' post-discovery statement that Decedent never regained consciousness after the shooting. *See* Dkt. No. 107-2 at 41, ¶ 109. Notwithstanding, in opposing summary judgment on this claim, Plaintiffs argue that the body camera footage "shows [Decedent] moving and breathing, with Annarino saying that he was still alive." Dkt. No. 107-1 at 23. They also cite testimony from Defendant Annarino that Decedent tried to push himself off the floor at some point during the shooting, "which would require consciousness." *Id.*

It is difficult to discern from the body camera footage whether Decedent was moving or breathing after all shots were fired. *See* Dkt. No. 99-9. A man can be heard shouting that

Decedent is still alive, but at that point in the video, Defendant Annarino's body is blocking Decedent from view. *See id.* at 0:08. Next, the video shows Defendant Annarino placing handcuffs on Decedent, which is partially obscured by Deputy Latic's hand moving in front of the camera. *See id.* at 0:09-1:30. During that time, Decedent appears to move his arms slightly. *See id.* at 0:26, 0:35. Blood is visible on the floor and door, as well as on Decedent's shirt. *See id.* at 0:40-1:05. Approximately a minute later, Defendant Annarino can be seen commenting that Decedent is still breathing. *See id.* at 2:09.

Importantly, Plaintiffs must prove that Decedent was *conscious*, not that he was alive. Although the body camera footage does not definitively show that Decedent was conscious after all shots were fired, Plaintiffs point to deposition testimony suggesting he may have been conscious after at least some of the shots were fired. *See* Dkt. No. 107-2 at 31-32, ¶ 84. Specifically, Defendant Annarino testified at deposition that Decedent "fell on the ground with a knife, [then] started getting up" by pushing himself off the ground. Dkt. No. 99-25 at 54:20-21, 55:13-16. At that point, according to Defendant Annarino's testimony, he "shot [Decedent] again until there wasn't a threat." *Id.* at 54:21-22.

This testimony suggests that at some point after the shooting began, but before all shots were fired, Decedent was conscious. As explained already, the parties dispute how quickly Defendant Annarino fired the seven shots. *See* Dkt. No. 107-2 at 37, ¶ 96; *compare* Dkt. No. 99-28 at 8:12-21 (an emergency medical technician testifying that the shots were "fired in a single burst"), *with* Dkt. No. 107-13 at 11 (a NYSP incident report stating that Defendant Annarino fired at Decedent, moved away from Decedent as he fell to the ground, saw Decedent begin to stand, and fired again). Moreover, it is not immediately clear how many gunshots missed or struck Decedent before he fell off the bed. *Compare* Dkt. No. 99-25 at 77:14-20 (Defendant Annarino

testifying that he was unsure where the first two gunshots went), *with id.* at 90:1-8 (Defendant Annarino testifying that he was approximately two feet from Decedent when he shot at him on the bed, and he did not initially realize a bullet hit Decedent while he was still on the bed). It is therefore possible for a reasonable jury to conclude that Decedent was conscious, for at least some duration, between the first eventually fatal gunshot and the conclusion of the shooting.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' conscious pain and suffering claim is denied.

**F. Negligent Infliction of Emotional Distress**

Plaintiffs allege that Defendant Annarino is liable for the emotional distress suffered by Plaintiff Robbie Johnson, who witnessed the shooting of his son. *See* Dkt. No. 1-8 at ¶¶ 124-26. According to the complaint, Plaintiff Robbie Johnson "was in the zone of danger at the time that [Decedent] was shot[.]" *Id.* at ¶ 124. Defendant Annarino argues that he is entitled to summary judgment because Plaintiff Robbie Johnson "cannot establish he was in the zone of danger at the time Decedent was shot and killed." Dkt. No. 99-1 at 18. Plaintiffs argue that a reasonable jury could find that Plaintiff Robbie Johnson was in the zone of danger because he "fear[ed] for his physical safety[.]" Dkt. No. 107-1 at 22 (citation and internal quotation marks omitted).

"Under New York law, a plaintiff may establish [a claim for NIED] in one of two ways: (1) the bystander theory; or (2) the direct duty theory." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (internal quotation marks omitted); *see Grant v. City of Syracuse*, No. 5:15-CV-445, 2017 WL 5564605, *14 (N.D.N.Y. Nov. 17, 2017). As is applicable here, "[a] plaintiff may recover for a purely emotional injury under the 'bystander' theory when: (1) [he] is threatened with physical harm as a result of [a] defendant's negligence; and (2) consequently . . . suffers emotional injury from witnessing the death or serious bodily injury of a member of [his]

immediate family." *Mortise*, 102 F.3d at 696 (citing *Bovsun v. Sanperi*, 61 N.Y.2d 219, 230-31 (1984)). Phrased differently, "a party may only recover for emotional damage resulting from witnessing an injury to an immediate family member if the alleged negligent act simultaneously exposes both the injured party and the plaintiff to an unreasonable risk of bodily injury or death." *Grant*, 2017 WL 5564605, at *14 (citation and internal quotation marks omitted).

As is relevant to Defendants' summary judgment argument on this claim, the parties dispute where Plaintiff Robbie Johnson was located when Defendant Annarino shot Decedent. Defendants assert that Defendant Annarino directed Plaintiff Robbie Johnson out of the bedroom before the shooting. *See* Dkt. No. 107-2 at 9, ¶ 32; Dkt. No. 99-25 at 12:2-7, 12:11-16 (Defendant Annarino testifying that he told Plaintiff Robbie Johnson to leave the bedroom). Plaintiffs aver that Plaintiff Robbie Johnson was pushed backwards, but instead of leaving the area, he remained in the bedroom doorway. *See* Dkt. No. 107-2 at 9, ¶ 32; Dkt. No. 107-5 at 42:23-25, 43:2-8, 46:24-25, 47:2 (Plaintiff Robbie Johnson testifying that he was pushed backwards and fell into the bedroom doorway, but did not leave until after the shooting concluded).

The record contains evidence that after Decedent fell to the ground, his head landed at Plaintiff Robbie Johnson's feet in or near the bedroom doorway. *See* Dkt. No. 107-2 at 37, ¶ 97; Dkt. No. 107-5 at 50:8-19; *see also* Dkt. No. 99-9 at 0:01-0:10 (body camera video showing Decedent on the ground with his body partially past the threshold of the bedroom doorway after the shooting). Additionally, Plaintiff Robbie Johnson testified that Defendant Annarino shot at Decedent while he was on the ground with his head on Plaintiff Robbie Johnson's feet. *See* Dkt. No. 107-5 at 50:8-19. According to Plaintiff Robbie Johnson's deposition testimony, the muzzle of Defendant Annarino's firearm was less than three feet away from Plaintiff Robbie Johnson. *See id.* at 50:16-19.

The location of Plaintiff Robbie Johnson at the time Decedent was shot and killed is material to the outcome of his bystander-theory NIED claim. *See Leverock v. Hall & Fuhs, Inc.*, 245 A.D.2d 550, 551 (2d Dep't 1997) (reversing summary judgment because there were material issues of fact about the plaintiffs' location and whether they were in the zone of danger); *cf. Grant*, 2017 WL 5564605, at *14 (granting a defendant's summary judgment motion as to a NIED claim because the plaintiff was not at risk of bodily harm). Defendants argue that Plaintiff Robbie Johnson was outside the zone of danger because he was behind Defendant Annarino, who never pointed his firearm at him. *See* Dkt. No. 99-1 at 18-19. However, as explained above, the record shows that Plaintiff Robbie Johnson was less than three feet from the muzzle of the gun, which suggests a risk of severe bodily harm. This potential risk is compounded by Plaintiff Robbie Johnson's testimony that Defendant Annarino shot at Decedent as he lay on the ground with his head on Plaintiff Robbie Johnson's feet.

Resolution of this claim will require fact-finding and credibility determinations by a jury. Accordingly, Defendants' motion is denied as to Plaintiff Robbie Johnson's NIED claim.

**G. Negligence**

Plaintiffs allege that Defendant Annarino is liable for negligence by "seizing, restraining, and pushing [Decedent] onto his back while [Decedent] was experiencing a seizure" and "fail[ing] to perform [his] duties with the degree of care that a reasonably prudent and careful law enforcement officer would have used under similar circumstances." Dkt. No. 1-8 at ¶ 113. Defendant Annarino asserts that he is entitled to summary judgment primarily because Plaintiffs' negligence claim is based on the same conduct as the Fourth Amendment claim. *See* Dkt. No. 99-1 at 19-20. He also broadly asserts that Plaintiffs fail to identify a duty, show how Defendant Annarino breached a duty, or provide proof of injury from the breach. *See id.* at 20. Plaintiffs

argue that the negligence claim must go to trial because a jury could find the underlying conduct either intentional or negligent. *See* Dkt. No. 107-1 at 22-23. Defendants' reply brief does not address Plaintiffs' arguments on this claim. *See* Dkt. No. 112.

To prove negligence under New York law, a plaintiff must demonstrate the following: "'(1) the defendant owed the [decedent] a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) [the decedent] suffered damage as a proximate result of that breach.'" *O'Connell v. Loucks*, No. 3:20-CV-34, 2022 WL 1046442, *3 (N.D.N.Y. Apr. 7, 2022) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998)). "Negligence is conduct falling beneath the standard of care which would be exercised by a reasonably prudent person in similar circumstances at the time of the conduct at issue." *Id.* (citations and internal quotation marks omitted).

Courts in this Circuit have stated that "'[w]hen a plaintiff asserts [an] excessive force . . . claim[] . . . premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to that same conduct will not lie.'" *Warr v. Liberatore*, 270 F. Supp. 3d 637, 655 (W.D.N.Y. 2017) (quoting *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002)). The underlying rationale is that "'[o]nce intentional offensive contact has been established, the [defendant] is liable for [an intentional tort] and not negligence, even when the physical injuries may have been inflicted inadvertently." *Id.* (quoting *Mazzaferro v. Albany Motel Enters., Inc.*, 127 A.D.2d 374, 376 (3d Dep't 1987)).

As Plaintiffs point out, however, courts are not always required to dismiss negligence claims asserted alongside excessive force claims. *See* Dkt. No. 107-1 at 22-23 (citing *Negron v.*

*City of New York*, 976 F. Supp. 2d 360, 372-73 (E.D.N.Y. 2013)). Plaintiffs rely on *Negron*,[6] where police officers tased a man who was experiencing psychosis. *See Negron*, 976 F. Supp. 2d at 363-64. The officers did not warn the man before they deployed the taser. *See id.* at 364. When the man was struck with the taser, he fell approximately ten feet, hit his head, and died. *See id.* The decedent's mother, as administratrix of his estate, brought claims for negligence and Fourth Amendment excessive force. *See id.* at 362-63. After denying the defendants' motion for summary judgment on the excessive force claim, the U.S. District Court for the Eastern District of New York considered whether the negligence claim could proceed alongside the excessive force claim. *See id.* at 371-73. In allowing the negligence claim to move forward, the Eastern District reasoned that there could be a viable negligence claim stemming from the officers' failure to warn the decedent before they deployed the taser. *See id.* at 373.

Here, Plaintiffs appear to predicate their negligence claim upon some of the same conduct underlying the excessive force claim: Defendant Annarino "seizing, restraining, and pushing [Decedent] onto his back while [he] was experiencing a seizure[.]" Dkt. No. 1-8 at ¶ 113. However, post-discovery, there is at least some evidence in the record that could lead a reasonable jury to find that during the same incident, Defendant Annarino negligently failed to follow his training on verbally de-escalating situations involving people in crisis. *See* Dkt. No. 107-10 at 9:8-24, 10:1-24, 11:1-24 (Defendant Annarino testifying about crisis intervention training he received at the New York State Police Academy and continues to receive annually, which

---

[6] At an earlier stage of this litigation, Judge David Hurd considered the pleading sufficiency of Plaintiffs' negligence claim against Defendant Annarino. *See* Dkt. No. 44 at 43-44. Citing *Negron*, which dealt with a summary judgment motion, Judge Hurd noted that a negligence claim asserted alongside an excessive force claim should only be dismissed "if '[n]o theory of negligence could plausibly apply to [the] alleged conduct.'" *Id.* at 44 (quoting *Negron*, 976 F. Supp. 2d at 373).

includes verbal de-escalation techniques). This evidence may demonstrate that Defendant Annarino "failed to perform [his] duties with the degree of care that a reasonably prudent and careful law enforcement officer would have used under similar circumstances[,]" as asserted in the complaint. Dkt. No. 1-8 at ¶ 113; *see also id.* at ¶ 88 (alleging that Defendant Annarino's "forceful response escalated [the] situation, ultimately leading to the use of deadly force, that instead could have been calmly de-escalated"). Thus, as in *Negron*, it may be appropriate for the negligence claim to proceed.

As for the injury requirement, the Court has already noted that the medical examiner's report suggests Decedent may have sustained injuries during the incident. *See* Dkt. No. 107-14 at 9. Plaintiffs also contend that Decedent's profane exclamation at Defendant Annarino evidences "emotional distress and fear from an unknown person grabbing and shaking him as he had a seizure or came out of a seizure." Dkt. No. 107-2 at 42-43, ¶ 113; *see* Dkt. No. 99-18 at 2 (Plaintiff Robbie Johnson stating, a few hours after the incident, that Decedent yelled something like, "What the fuck!" as Defendant Annarino tried to roll him over); Dkt. No. 99-19 at 2 (same); Dkt. No. 107-5 at 68:21-24 (Plaintiff Robbie Johnson testifying that Decedent said, "Who the fuck are you?").

It is obvious that the circumstances of this incident are pervasively disputed. These disputes of fact prevent the Court from opining on what a reasonable officer in similar circumstances would have, could have, or should have done. Accordingly, drawing all reasonable inferences in the nonmovant's favor, Defendants' motion for summary judgment is denied as to the negligence claim.

**H. Disability Claims**

Invoking the RA and Title II of the ADA (collectively, "the Acts"), Plaintiffs allege that

Defendant NYSP unlawfully failed to accommodate Decedent's seizure disorder. *See* Dkt. No. 1-8 at ¶¶ 78-92. The complaint alleges that "Tyler Johnson was a disabled person by virtue of a seizure disorder that substantially limited one or more of his major life activities, including his ability to drive and hold a job." *Id.* at ¶ 82. According to the complaint:

> Defendant[] [NYSP] . . . fail[ed] to provide adequate training, resources, supervision, or discipline to law enforcement regarding the appropriate way of responding to individuals who exhibit the signs and symptoms of seizure disorders, including by failing to instruct officers not to restrain someone having a seizure and to keep them on the side of their body.

*Id.* at ¶ 85. The complaint further alleges that "NYSP's failure to provide such training, resources, supervision, or discipline was done out of discriminatory animus towards those with seizure disorders." *Id.* at ¶ 86. Plaintiffs assert that Defendant NYSP unlawfully failed to accommodate Decedent's disability by "den[ying] him the benefits of the services, programs, and activities to which he was entitled, including the right to lawful police and emergency medical services, the right to be free of discriminatory or disparate treatment by virtue of his disability, and the right to due process of the law." *Id.* at ¶ 91.

"'Generally, claims brought under the ADA and the RA are so similar that they may be analyzed together.'" *Worden v. Oneida Cnty.*, No. 6:25-CV-1234, 2026 WL 2641381, *26 (N.D.N.Y. Sept. 8, 2026) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). To establish a *prima facie* violation of the Acts, Plaintiffs must plead and prove the following: "'1) [Decedent was] a qualified individual with a disability; 2) [Defendant NYSP] is an entity subject to the [A]cts; and 3) [Decedent] was denied the opportunity to . . . benefit from [Defendant NYSP's] services, . . . or [Defendant NYSP] otherwise discriminated against him by reason of his disability.'" *Torres v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:20-CV-

301, 2024 WL 3498500, *7 (N.D.N.Y. Mar. 13, 2024) (quoting *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)).

In this context, a qualifying disability refers to "a 'physical or mental impairment that substantially limits one or more major life activities[.]'" *Id.* (quoting 29 C.F.R. § 1630.2(g)).

> For an impairment to substantially limit the major life activity of working, such that it qualifies as a disability under the ADA, it must render the individual significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

*Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 137 (E.D.N.Y. 2015) (citations and internal quotation marks omitted). "A class of jobs encompasses a breadth of positions related to the one a plaintiff cannot perform, not simply analogous positions with slight variations." *Wegner v. Upstate Farms Co-op., Inc.*, 560 Fed. Appx. 22, 24 (2d Cir. 2014) (summary order) (citing *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir. 1999)).

Plaintiffs assert that Decedent had a qualifying disability because "[t]he record demonstrates that [his] epilepsy and seizures limited his ability to work, which constitutes a 'major life activity[,]'" and that Defendant NYSP failed to accommodate Decedent's disability in its emergency response. Dkt. No. 107-1 at 24-27. Defendants primarily argue that Plaintiffs fail to raise a triable question of material fact as to "whether Decedent was a qualified individual with a disability[.]"[7] Dkt. No. 99-1 at 23. They also argue that even if the record establishes that

[7] The parties disagree on whether Defendant NYSP previously conceded that Decedent was a qualifying individual with a disability. In arguing that Defendant NYSP made this concession at the motion to dismiss stage, Plaintiffs cite Judge Hurd's Decision and Order dated March 2, 2023. *See* Dkt. No. 107-1 at 24 (citing Dkt. No. 44 at 30). In ruling on the pleading sufficiency of Plaintiffs' claims, Judge Hurd stated that Defendant NYSP "concede[d] that [D]ecedent was a 'qualified individual with a disability.'" Dkt. No. 44 at 30. In its reply papers related to the instant motion, Defendant NYSP contends that it "made no such affirmative concession[,]" but instead "chose, prior to [its] answer, not to make a motion to dismiss on this issue." Dkt. No. 112 at 14

Decedent had a qualifying disability, Plaintiffs fail to show that Defendant NYSP "intentionally failed to provide a reasonable accommodation." *Id.*

Where a plaintiff asserts substantial limitations on a person's ability to work as evidence of a qualifying disability, the Second Circuit requires the plaintiff to show that the claimed disability precluded the affected individual "from working in a *class or broad range of jobs*." *Woolf v. Strada*, 949 F.3d 89, 95 (2d Cir. 2020) (footnote omitted) (emphasis in original). Defendants argue that Plaintiffs fail to adduce such evidence. *See* Dkt. No. 99-1 at 23-24. In response, Plaintiffs contend that "[Decedent's] employability was limited by his lack of education and the seriousness of his epilepsy." Dkt. No. 107-1 at 25. They also assert that "[Decedent's] seizures were physically incapacitating and intensified over the years." *Id.*

Plaintiffs rely on Plaintiff Robbie Johnson's deposition testimony that Decedent never completed high school or earned an equivalency credential, never attended a trade school, and never tried to obtain on-the-job occupational training. *See* Dkt. No. 107-1 at 25 (citing Dkt. No. 107-5 at 4:2-18). Plaintiff Robbie Johnson also testified that Decedent worked "[o]dd jobs, fixing things for people," and worked for a short time at Burger King and McDonald's. Dkt. No. 107-5 at 3:17-19. According to Plaintiff Robbie Johnson, "because of [Decedent's] seizure conditions, people thought he was a liability." *Id.* at 3:19-20. He testified that Decedent's seizures intensified over time. *See id.* at 7:24, 11:25.

As for the frequency of Decedent's seizures, the record shows that Decedent was evaluated at Rome Memorial Hospital on April 21, 2018, for a "single isolated seizure" and reported that his last seizure was one year prior. Dkt. No. 99-36 at 3. That same exhibit contains hospital records

n.13. The Court has reviewed Defendant NYSP's motion to dismiss, which it made before discovery ever opened, and does not discern any affirmative concession that Plaintiffs satisfied their evidentiary burden for the first element of their disability claims. *See* Dkt. No. 29-1 at 9-11.

dated March 7, 2017, when Decedent reported that his last seizure was approximately eighteen months prior. *See id.* at 1.

Plaintiffs contend that "[t]hese facts are sufficient to show a disqualification from a class of jobs." Dkt. No. 107-1 at 25 (citing *McCormack v. Long Island R.R. Co.*, No. 03-CV-6597, 2006 WL 490032, *5-6 (S.D.N.Y. Feb. 28, 2006)). In *McCormack*, the U.S. District Court for the Southern District of New York considered whether the plaintiff's epilepsy and alcoholism substantially limited major life activities, including his ability to work. *See McCormack*, 2006 WL 490032, at *4 & n.2. The Southern District noted that:

> [t]o assess limitations in a class of jobs, "[courts] begin by identifying [the individual's] pertinent 'training, knowledge, skills or abilities,' and then . . . compare the jobs utilizing those qualifications with the jobs from which [the individual] is excluded and ask whether exclusion from the latter is a significant restriction with respect to the former."

*Id.* at *5 (quoting *Bartlett v. N.Y. State Bd. of L. Exam'rs*, 226 F.3d 69, 83 (2d Cir. 2000)). Accordingly, the court considered the plaintiff's educational background to determine which jobs he could potentially perform, rather than as standalone evidence that his disability substantially limited his ability to work. *See id.* at *5-6. In concluding that the evidence could establish existence of a qualifying disability, the Southern District noted that the plaintiff had a high school education, had only ever worked for one employer (the Long Island Railroad), and had been medically disqualified from certain railroad job functions for safety reasons after he lost consciousness on the job. *See id.* at *2, *5-6.

The Court acknowledges that Decedent's limited education probably reduced his job prospects. However, unlike in *McCormack*, the record lacks evidence showing a relationship between Decedent's seizures and his difficulty maintaining employment. Beyond Plaintiff Robbie

Johnson's vague statement that other people considered Decedent a liability because he had seizures, Plaintiffs have not presented evidence that Decedent's seizure condition substantially limited his ability to work. Although Ashley Russell testified that Decedent was fired from Burger King and quit his job at McDonald's because "[h]e didn't like how they were treating him[,]" her testimony does not suggest any link between Decedent's seizure condition and his ability to obtain or keep a job. Dkt. No. 99-30 at 8:13-16, 9:4-11. Additionally, the Court has reviewed records of Decedent's earnings at various jobs in the years leading up to his death, but none of those records discuss or allude to his medical condition. *See* Dkt. No. 99-37. Plaintiffs also have not cited any evidence connecting Decedent's education level to his seizures.

Although the record suggests that Decedent had difficulties with long-term employment, Plaintiffs have not established that Decedent's seizures substantially limited his ability to obtain employment available to someone with his level of education.[8] Moreover, the Court agrees with Defendants that Plaintiffs have not "identif[ied] what 'class or broad range of jobs' were inaccessible to Decedent because of his medical condition." Dkt. No. 112 at 14. Because Plaintiffs predicate their allegations of Decedent's qualifying disability on its substantial interference with his ability to work, the ADA and RA claims fail.

Accordingly, Defendants' motion is granted as to the disability claims, and Defendant NYSP is ordered dismissed from this action.

## IV. CONCLUSION

[8] The Court acknowledges Plaintiffs' citation to authority that classifies epilepsy as a physical or mental impairment. *See* Dkt. No. 107-1 at 24 (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 216 (2d Cir. 2001); 29 C.F.R. § 1615.103(1)(ii)). Under their inability-to-work theory, however, Plaintiffs must also establish that Decedent's physical or mental impairment substantially limited his ability to work.

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 99) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Plaintiffs' disability claims against Defendant New York State Police (the fourth cause of action in the complaint) are **DISMISSED**; and the Court further

**ORDERS** that Plaintiffs' Fourth Amendment, negligence, pain and suffering, negligent infliction of emotional distress, and wrongful death claims against Defendant Annarino (the first, eighth, ninth, tenth, and thirteenth causes of action in the complaint) **REMAIN for trial**; and the Court further

**ORDERS** that Plaintiff Ashley Russell and Defendant New York State Police be **TERMINATED** from this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge